**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED JULY 18, 2007

*In re* REQUEST FOR ADVISORY
OPINION REGARDING
CONSTITUTIONALITY OF 2005 PA 71

No. 130589

_____

BEFORE THE ENTIRE BENCH

YOUNG, J.

Article 3, § 8 of the Michigan Constitution allows the Governor or either house of the Legislature to request the opinion of this Court "on important questions of law upon solemn occasions as to the constitutionality of legislation . . . ." We granted the House of Representatives' request to opine on the constitutionality of 2005 PA 71, MCL 168.523. Of concern to the House is the constitutionality of the requirement that voters either present photo identification or sign an affidavit averring that the voter lacks photo identification before voting.

We hold that the photo identification requirement contained in the statute is facially constitutional under the balancing test articulated by the United States

Supreme Court in *Burdick v Takushi*.[1]  The identification requirement is a reasonable, nondiscriminatory restriction designed to preserve the purity of elections and to prevent abuses of the electoral franchise, as demanded by art 2, § 4 of the Michigan Constitution, thereby preventing lawful voters from having their votes diluted by those cast by fraudulent voters.  Moreover, as no voter is required to incur the costs of obtaining a photo identification card as a condition of voting, the identification obligation imposed by MCL 168.523(1) cannot properly be characterized as an unconstitutional poll tax under the Twenty-fourth Amendment of the United States Constitution.

## I. UNDERLYING BACKGROUND FACTS

In 1996, our Legislature amended the Michigan Election Law, MCL 168.1 *et seq.*, to include § 523, which required a voter to present photo identification before voting.  The 1996 amendment was nearly identical to the statutory provision at issue in this case.[2]  However, before the amendment became effective, an opinion of the Attorney General issued, concluding that the photo identification requirement in § 523 violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.[3] Specifically, the Attorney General

---

[1] 504 US 428; 112 S Ct 2059; 119 L Ed 2d 245 (1992).

[2] See 1996 PA 583.

[3] See OAG, 1997-1998, No 6930, p 1 (January 29, 1997).  We note in passing that OAG, No 6930 appears not to have been initiated in accordance with MCL 14.32, which requires the Attorney General to issue opinions only in
(continued…)

2

opinion indicated that the photo identification requirement was "not necessary to further a compelling state interest" in the absence of evidence of "substantial voter fraud in Michigan" and that the requirement imposed "economic and logistical burdens" on those without photo identification.[4]  Therefore, although the law was passed by both houses and signed by the Governor, the Secretary of State has never complied with or enforced this validly enacted law.[5]

Subsequent events brought renewed interest in election reform.  The 2000 presidential election revealed highly publicized alleged deficiencies in the electoral system in several states.[6]  In an effort to address these deficiencies, Congress passed the Help America Vote Act (HAVA) in 2002, which imposed

---

(…continued)
response to "questions of law submitted to him by the legislature, or by either branch thereof . . . ."

[4] OAG No 6930, pp 3, 5.

[5] Relying on obiter dictum found in *Traverse City School Dist v Attorney General*, 384 Mich 390, 407 n 2; 185 NW2d 9 (1971), both the supporting and the opposing Attorney General maintain that opinions issued by the Attorney General are "binding upon state agencies."  Because the effect of an Attorney General opinion is beyond the scope of the advisory opinion, we decline to address the statutory or constitutional basis for the claim that opinions of the Attorney General are binding in the present opinion.  Cf. *East Grand Rapids School Dist v Kent Co Tax Allocation Bd*, 415 Mich 381; 330 NW2d 7 (1982).

[6] See the report of the National Commission on Federal Election Reform (Ford-Carter Commission), *To Assure Pride and Confidence in the Electoral Process* (August 2001).  The commission was "formed in the wake of the 2000 election crisis" to "offer a bipartisan analysis" of election reform. <http://www.reformelections.org/ncfer.asp> (accessed December 19, 2006).

minimum administration standards on state elections.[7] HAVA requires that first-time voters who register by mail present proof of identity in the form of photo identification or other alternative documentation.[8] In addition, HAVA specifically indicates that its provisions establish *minimum* requirements, explicitly authorizing states to institute consistent "administration requirements that are *more strict*" than the federal requirements.[9]

After the enactment of HAVA, the Commission on Federal Election Reform was formed to "assess HAVA's implementation" and to "offer recommendations for further improvement."[10] The findings and recommendations of the commission were released in September 2005. One recommendation proposed that voters provide photo identification in order to deter fraud and enhance ballot integrity.[11] The commission noted that "[t]he electoral system

---

[7] 42 USC 15301 through 15545.

[8] See 42 USC 15483(b)(2). The statute permits a voter to present "current and valid photo identification" or "a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter."

[9] 42 USC 15484 (emphasis added).

[10] See Commission on Federal Election Reform (hereinafter Carter-Baker Commission), *Building Confidence in U.S. Elections*, p 1 (September 19, 2005). This 21-member bipartisan commission was cochaired by former President Jimmy Carter and former United States Secretary of State James A. Baker, III. <http://www.american.edu/ia/cfer/> (accessed December 19, 2006).

[11] Carter-Baker Commission, *supra* at 21. The Carter-Baker Commission recommended that states require voters to use the "REAL ID card" to vote. The
(continued…)

4

cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters. Photo IDs currently are needed to board a plane, enter federal buildings, and cash a check. Voting is equally important."[12]

MCL 168.523, with its photo identification requirement, was amended by 2005 PA 71. Concerned by the adverse Attorney General opinion regarding the previous enactment of § 523, the Michigan House of Representatives adopted a resolution requesting that this Court issue an advisory opinion regarding whether the photo identification requirements contained in 2005 PA 71 violate either the Michigan Constitution or the United States Constitution.[13] We granted the request, asking the Attorney General to submit briefs and argue as both opponent and proponent of the issue.[14]

## II. APPLICABLE STANDARDS AND JURISDICTIONAL ISSUES

The question presented in this original proceeding, whether MCL 168.523 is facially violative of either the Michigan Constitution or the United States

---

(…continued)
Real ID Act of 2005, PL 109-13, 2005 HR 1268, was enacted on May 11, 2005. The act requires that federal agencies accept only state-issued driver's licenses and identification cards that meet stringent information requirements.

[12] Carter-Baker Commission, *supra* at 18.

[13] See 2006 House Journal 17 (Resolution No. 199, February 21, 2006).

[14] 474 Mich 1230 (2006). To prevent confusion, the terms "supporting Attorney General" and "opposing Attorney General" will be used throughout this opinion to identify the briefs and argument submitted by the Attorney General as the proponent and opponent, respectively, of the constitutionality of 2005 PA 71.

Constitution, is purely a question of law. To the degree the provisions are congruous, this Court has previously construed Michigan's equal protection provision[15] to be coextensive with the Equal Protection Clause of the federal constitution.[16]

A statute challenged on a constitutional basis is "clothed in a presumption of constitutionality,"[17] and the burden of proving that a statute is unconstitutional rests with the party challenging it.[18] A party challenging the facial constitutionality of a statute "faces an extremely rigorous standard,"[19] and must show that "'"no set of circumstances exists under which the [a]ct would be valid."'"[20]

---

[15] Const 1963, art 1, § 2.

[16] US Const, Am XIV. *Crego v Coleman*, 463 Mich 248, 258; 615 NW2d 218 (2000), citing *Frame v Nehls*, 452 Mich 171, 183; 550 NW2d 739 (1996), and *Doe v Dep't of Social Services*, 439 Mich 650, 670-671; 487 NW2d 166 (1992). However, in *Lind v Battle Creek*, 470 Mich 230, 235; 681 NW2d 334 (2004) (Young, J., concurring), it was noted that Const 1963, art 1, § 2 contained specific antidiscrimination provisions not found in its federal counterpart.

[17] *Cruz v Chevrolet Grey Iron Div of Gen Motors Corp*, 398 Mich 117, 127; 247 NW2d 764 (1976).

[18] *DeRose v DeRose*, 469 Mich 320; 666 NW2d 636 (2003); *Tolksdorf v Griffith*, 464 Mich 1; 626 NW2d 163 (2001); *In re Trejo Minors*, 462 Mich 341; 612 NW2d 407 (2000).

[19] *Judicial Attorneys Ass'n v Michigan*, 459 Mich 291, 310; 586 NW2d 894 (1998) (Taylor, J., dissenting).

[20] *Straus v Governor*, 459 Mich 526, 543; 592 NW2d 53 (1999), quoting *United States v Salerno*, 481 US 739, 745; 107 S Ct 2095; 95 L Ed 2d 697 (1987)

(continued…)

6

As a preliminary matter, the opposing Attorney General claims that this Court lacks the constitutional authority to issue an advisory opinion in this case because the request for the advisory opinion was untimely. Const 1963, art 3, § 8 provides that either house of the Legislature or the Governor may request an advisory opinion regarding the constitutionality of legislation "after [the legislation] has been enacted into law but before its effective date."

The opposing Attorney General maintains that, because 2005 PA 71 was an amendment of 1996 PA 583, MCL 8.3u dictates that the effective date of 2005 PA 71 was March 31, 1997, the effective date of 1996 PA 583.[21] Essentially, the opposing Attorney General claims that Const 1963, art 3, § 8 cannot be satisfied because the effective date of the public act occurred eight years before 2005 PA 71

---

(…continued)

(citation omitted.). A facial challenge is a claim that the law is "invalid *in toto* - and therefore incapable of any valid application . . . ." *Steffel v Thompson*, 415 US 452, 474; 94 S Ct 1209; 39 L Ed 2d 505 (1974).

The other type of constitutional challenge is an "as applied" challenge. An "as applied" challenge considers the specific application of a facially valid law to individual facts. *Crego v Coleman*, 463 Mich 248; 615 NW2d 218 (2000); *Boddie v Connecticut*, 401 US 371; 91 S Ct 780; 28 L Ed 2d 113 (1971). An "as applied" challenge is not possible at this juncture, as the statute has yet to be enforced.

[21] MCL 8.3u provides:

The provisions of any law or statute which is re-enacted, amended or revised, so far as they are the same as those of prior laws, shall be construed as a continuation of such laws and not as new enactments. If any provision of a law is repealed and in substance re-enacted, a reference in any other law to the repealed provision shall be deemed a reference to the re-enacted provision.

7

existed. This misconstrues MCL 8.3u, which merely requires that once a reenacted, amended, or revised law becomes operational, it is treated as a continuation of the prior law. It is axiomatic that a statute becomes operational only upon its effective date.[22] Moreover, MCL 8.3 indicates that MCL 8.3u is to be observed "unless such construction would be inconsistent with the manifest intent of the legislature." The manifest intent of the Legislature indicates that the effective date of 2005 PA 71 was January 1, 2007. Because the House of Representatives requested an advisory opinion well before that date, this Court indisputably has jurisdiction under art 3, § 8 to render an advisory opinion in this matter.

## III. RELEVANT STATUTORY PROVISIONS

The statute at issue, MCL 168.523, provides in relevant part:

> (1) At each election, before being given a ballot, each registered elector offering to vote shall identify himself or herself by presenting an official state identification card . . . , an operator's or chauffeur's license . . . , or other generally recognized picture identification card and by executing an application showing his or her signature or mark and address of residence in the presence of an election official. . . . If the elector does not have an official state identification card, operator's or chauffeur's license as required in this subsection, or other generally recognized picture identification card, the individual shall sign an affidavit to that effect before an election inspector and be allowed to vote as otherwise provided in this act. However, an elector being allowed to vote without the

_____

[22] Const 1963, art 4, § 27 ("No act shall take effect until the expiration of 90 days from the end of the session at which it was passed, but the legislature may give immediate effect to acts by a two-thirds vote of the members elected to and serving in each house.").

8

identification required under this subsection is subject to challenge as provided in section 727.

The statutory provision requires that a registered elector perform two distinct acts before being given a ballot. First, the elector must present photo identification in the form of a driver's license, state identification card, or "other generally recognized picture identification card."[23] Second, the elector must execute, in the presence of an election official, an application bearing the elector's signature and address. The statute specifically provides that in the event that an elector does not have the necessary photo identification, an elector need only "sign an affidavit to that effect" before the elector shall "be allowed to vote." The statute indicates, however, that an elector voting without identification is "subject to challenge" under the challenge procedures outlined in MCL 168.727.[24]

---

[23] Because, in reliance on OAG No 6930, the Secretary of State has never enforced the statute or promulgated rules and regulations, there is no basis for this Court to speculate regarding what type of identification might eventually constitute "generally recognized picture identification . . . ." The duty to promulgate rules and regulations concerning acceptable alternate photo identification lies exclusively with the Secretary of State under MCL 168.31(1).

[24] Any voter, including those voters presenting photo identification, may be challenged pursuant to MCL 168.727. The statute imposes differing requirements on different challengers. An election inspector is *required* to challenge a ballot applicant "if the inspector knows or has good reason to suspect that the applicant is not a qualified and registered elector of the precinct, or if a challenge appears in connection with the applicant's name in the registration book." A registered elector *may* challenge an applicant "if the elector knows or has good reason to suspect that individual is not a registered elector in that precinct." MCL 168.727(1). Those who challenge voters may not "challenge indiscriminately" or "without good cause," and face criminal sanctions if qualified voters are challenged for the purpose of annoyance or delay. MCL 168.727(3).

(continued…)

The opposing Attorney General maintains that voters without photo identification are impermissibly burdened because the phrase "subject to" indicates that the challenge procedure is not discretionary, but is compulsory whenever a voter seeks to vote without photo identification. However, this claim is not supported by the language of the statute. The plain meaning of the phrase "subject to" connotes possibility, and in this context is appropriately defined as meaning "open or exposed to."[25] Moreover, another provision of § 523(1), a mere three sentences from the provision at issue, describes a situation in which the application of the challenge procedure is clearly mandatory, as indicated by use of the phrase "*shall* be challenged."[26] Here, the Legislature chose to use the particular phrase "subject to challenge" rather than the mandatory phrase "shall be

_____

(…continued)

Once challenged, a voter is required to swear to answer truthfully and answer questions "concerning his qualifications as an elector . . . ." MCL 168.729. If the challenged voter answers qualification questions satisfactorily, the challenged voter "shall be entitled to receive a ballot and vote." The ballot cast by a challenged voter is marked (and the mark subsequently concealed) with a number corresponding to the voter's poll list number, and is counted as a regular ballot. MCL 168.745; MCL 168.746. The marked ballot becomes relevant only in the event of litigation surrounding a contested election, where the challenged voter's qualifications to vote are disputed. MCL 168.747; MCL 168.748.

[25] *Webster's New Universal Dictionary*, *Unabridged Edition* (1996), p 1893.

[26] "If the signature or an item of information [from the voter registration list] does not correspond, the vote of the person *shall be challenged,* and the same procedure shall be followed as provided in this act for the challenging of an elector." MCL 168.523(1) (emphasis added).

challenged." The fact that the Legislature used both the mandatory and permissive language concerning challenges of electors within the same statutory provision suggests that there is no basis for concluding that it intended "subject to" to be the equivalent to "shall." We presume that the Legislature intended the meaning of the words used in the statute, and we may not substitute alternative language for that used by the Legislature.[27] Therefore, we interpret the last sentence of § 523(1) to indicate that an elector voting without photo identification faces the *possibility* of challenge under § 727, but that the challenge procedure is not compulsory. Rather, utilizing the plain language of § 727, *any voter*, including those without photo identification, may be challenged, but *only* if the person challenging the voter "knows or has good reason to suspect" that the voter is not a registered elector of that precinct.[28]

## IV. CONSTITUTIONAL CHALLENGE
## A. NATURE OF THE COMPETING INTERESTS

The "right to vote" is not expressly enumerated in either our state or the federal constitution.[29] Rather, it has been held that the right to vote is an implicit

---

[27] *People v Crucible Steel Co of America*, 150 Mich 563; 114 NW 350 (1907); *Helder v Sruba*, 462 Mich 92; 611 NW2d 309 (2000); *Robertson v DaimlerChrysler Corp,* 465 Mich 732; 641 NW2d 567 (2002).

[28] There is no basis to conclude that a voter who merely executes an affidavit, without more, presents a challenger with "good reason to suspect" that the voter is not a registered elector of a precinct.

[29] See *San Antonio Independent School Dist v Rodriguez*, 411 US 1, 35 n 78; 93 S Ct 1278; 36 L Ed 2d 16 (1973) ("[T]he right to vote, *per se*, is not a constitutionally protected right . . . .").

11

"'fundamental political right'" that is "'preservative of all rights.'"[30]   As the United States Supreme Court noted, "a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."[31]   However, "[t]his 'equal right to vote' is not absolute . . . ."[32]

Balanced against a citizen's "right to vote" are the constitutional commands given by the people of Michigan to the Legislature in Const 1963, art 2, § 4, which states in relevant part:

> The legislature shall enact laws to regulate the time, place and manner of all nominations and elections, except as otherwise provided in this constitution or in the constitution and laws of the United States. *The legislature shall enact laws to preserve the purity of elections*, to preserve the secrecy of the ballot, *to guard against abuses of the elective franchise*, and to provide for a system of voter registration and absentee voting. [Emphasis added.]

Under art 2, § 4, in addition to the legislative responsibility of regulating the "time, place and manner" of elections, the Legislature has been specifically commanded by the people of Michigan to "preserve the purity of elections" and

---

[30] *Reynolds v Sims*, 377 US 533, 562; 84 S Ct 1362; 12 L Ed 2d 506 (1964) (citation omitted).

[31] *Dunn v Blumstein,* 405 US 330, 336; 92 S Ct 995; 31 L Ed 2d 274 (1972).

[32] *Id*. (States may "impose voter qualifications," and "regulate access to the franchise in other ways.")  See also *Carrington v Rash*, 380 US 89, 91; 85 S Ct 775; 13 L Ed 2d 675 (1965) (noting that states have historically possessed "'broad powers to determine the conditions under which the right of suffrage may be exercised,'" quoting *Lassiter v Northampton Co Bd of Elections*, 360 US 45, 50; 79 S Ct 985; 3 L Ed 2d 1072 [1959]).

"to guard against abuses of the elective franchise." These provisions have been a part of our constitution for almost as long as Michigan has been a state.[33]

As this Court noted in the nineteenth century, the purpose of a law enacted pursuant to these constitutional directives "is not to prevent any qualified elector from voting, or unnecessarily to hinder or impair his privilege. *It is for the purpose of preventing fraudulent voting*." [34] Under the Legislature's authority to "preserve the purity of elections" and "to guard against abuses of the elective franchise," the Legislature may "regulate, but cannot *destroy*, the enjoyment of the elective franchise."[35]

In addition to the specific legislative mandate to prevent fraudulent voting contained in the Michigan Constitution, federal jurisprudence has long recognized

---

[33] The constitutional authority to prevent fraudulent voting was first given to the Legislature in the 1850 Michigan Constitution. See Const 1850, art 7, § 6 ("Laws may be passed to preserve the purity of elections and guard against abuses of the elective franchise."). The 1908 Constitution altered the language of the provision to make clear that the duty was obligatory, explicitly providing that "[l]aws shall be passed to preserve the purity of elections and guard against abuses of the elective franchise . . . ." Const 1908 art 3, § 8. When the 1963 Constitution was ratified by the people, the responsibility to pass laws preventing fraudulent voting was explicitly vested in the Legislature, and the Address to the People pointedly stated that "[t]he legislature is *specifically directed* to enact corrupt practices legislation." 2 Official Record, Constitutional Convention 1961, p 3366 (emphasis added).

[34] *Attorney General ex rel Conely v Detroit Common Council*, 78 Mich 545, 559; 44 NW 388 (1889) (emphasis added).

[35] *Brown v Kent Co Bd of Election Comm'rs*, 174 Mich 477, 479; 140 NW 642 (1913) (emphasis added).

13

that a state has the authority to regulate elections under the federal constitution as well as a "compelling interest in preventing voter fraud."[36] Article I, § 4 of the federal constitution provides that states may prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives . . . ."[37] In *Smiley v Holm*,[38] the United States Supreme Court discussed the scope of state authority to regulate federal elections under art 1, § 4:

> It cannot be doubted that these comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; *in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved.*

Federal jurisprudence has likewise recognized that states retain the power to regulate state and local elections, subject to federal constitutional and statutory limitations.[39]

---

[36] *Purcell v Gonzalez*, 549 US ___, ___; 127 S Ct 5, 7; 166 L Ed 2d 1, 4 (2006). See also *Burson v Freeman*, 504 US 191, 199; 112 S Ct 1846; 119 L Ed 2d 5 (1992); *Rosario v Rockefeller*, 410 US 752; 93 S Ct 1245; 36 L Ed 2d 1 (1973).

[37] US Const, art I, § 4, cl 1.

[38] 285 US 355, 366; 52 S Ct 397; 76 L Ed 795 (1932) (emphasis added).

[39] *Burdick*, supra at 433; *Tashjian v Republican Party of Connecticut*, 479 US 208, 217; 107 S Ct 544; 93 L Ed 2d 514 (1986); *Sugarman v Dougall*, 413 US 634; 93 S Ct 2842; 37 L Ed 2d 853 (1973); *Boyd v Nebraska ex rel Thayer*, 143 US 135, 161; 12 S Ct 375; 36 L Ed 103 (1892) ("Each State has the power to

(continued…)

14

In addition to possessing the constitutional authority to regulate elections, the United States Supreme Court has also recognized that states have a compelling interest in preserving the integrity of their election processes, including an interest in "ensuring that an individual's right to vote is not undermined by fraud in the election process."[40] As the Supreme Court observed in *Purcell*:[41]

> Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised. "The right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."

Thus, fraudulent voting effectively dilutes the votes of lawful voters. By instituting requirements to guard against abuse of the elective franchise, a state protects the right of lawful voters to exercise their full share of this franchise.

---

(…continued)
prescribe the qualifications of its officers and the manner in which they shall be chosen . . . .").

[40] *Burson*, *supra* at 199.

[41] *Purcell*, *supra*, 549 US at ___; 127 S Ct at 7; 166 L Ed 2d at 4, quoting *Reynolds v Sims*, *supra* at 555. Voter disenfranchisement through vote dilution is a problem that is also addressed by the Voting Rights Act, 42 USC 1973.

In order to protect that compelling interest, a state may enact "generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process,"[42] because

> [c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."[43]

In sum, while a citizen's right to vote is fundamental, this right is not unfettered. It competes with the state's compelling interest in preserving the integrity of its elections and the Legislature's constitutional obligation to preserve the purity of elections and to guard against abuses of the elective franchise, including ensuring that lawful voters not have their votes diluted.

## B. STANDARD OF SCRUTINY

### i. FEDERAL JURISPRUDENCE

Generally, where a law classifies by a suspect category, or "where a law classifies in such a way as to infringe constitutionally protected fundamental

---

[42] *Anderson v Celebrezze*, 460 US 780, 788 n 9; 103 S Ct 1564; 75 L Ed 2d 547 (1983).

[43] *Burdick*, *supra* at 433 (citation omitted). See also *Timmons v Twin Cities Area New Party*, 520 US 351, 358; 117 S Ct 1364; 137 L Ed 2d 589 (1997) (holding "that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election and campaign-related disorder").

rights, heightened scrutiny under the Equal Protection Clause is required."[44]

However, in the context of assessing a challenge to the constitutionality of an election law, the United States Supreme Court has rejected the notion that every election law must be evaluated under strict scrutiny analysis.[45] The Court recognized that "to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently."[46] Rather, the Court has held that a "flexible standard" is applicable:

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

> Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment

---

[44] *Attorney General of New York v Soto-Lopez*, 476 US 898, 906 n 6; 106 S Ct 2317; 90 L Ed 2d 899 (1986). Suspect categories include race, alienage, or national origin.

[45] Under a strict scrutiny standard of constitutional review, "[t]he State must show that the 'regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.'" *Burson*, *supra* at 198 (quoting *Perry Ed Ass'n v Perry Local Educators' Ass'n*, 460 US 37, 45; 103 S Ct 948; 74 L Ed 2d 794 [1983]).

[46] *Burdick*, *supra* at 433.

17

rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions. [47]

Thus, the first step in determining whether an election law contravenes the constitution is to determine the nature and magnitude of the claimed restriction inflicted by the election law on the right to vote, weighed against the precise interest identified by the state. If the burden on the right to vote is severe, then the regulation must be "narrowly drawn" to further a compelling state interest. However, if the restriction imposed is reasonable and nondiscriminatory, then the law is upheld as warranted by the important regulatory interest identified by the state. The United States Supreme Court has stressed that each inquiry is fact and circumstance specific, because "[n]o bright line separates permissible election-related regulation from unconstitutional infringements . . . ."[48]

Like every election regulation, MCL 168.523(1) imposes to some degree a burden on an elector.[49] However, the photo identification requirement contained

---

[47] *Id.* at 434 (internal citation omitted).

[48] *Timmons*, *supra* at 359. See also *Storer v Brown*, 415 US 724, 730; 94 S Ct 1274; 39 L Ed 2d 714 (1974) (noting that there is "no litmus-paper test for separating those [election] restrictions that are valid from those that are invidious under the Equal Protection Clause").

[49] As the Supreme Court has observed, *all* election laws "invariably impose some burden upon individual voters." *Burdick*, *supra* at 433. In Michigan, a voter

(continued…)

18

in the statute does not impose a severe burden upon an elector's right to vote. For the overwhelming majority of registered voters in Michigan, the statute merely requires the presentation of photo identification that the voter already possesses.[50] The opposing Attorney General does not claim that requiring an elector to identify himself imposes a severe burden on the right to vote, nor claims that the act of

---

(…continued)

is required to meet minimum age and residency qualifications to register as an elector and must register to vote by executing a registration affidavit in accordance with MCL 168.495. The voter is required to vote at the correct polling place during the hours the polls are open (unless they qualify for an absentee ballot), wait in line, execute an application with the voter's signature and residence, and utilize whatever voting machine is available at the polling place. Moreover, the voter may not have his write-in vote counted unless the candidate has filed a declaration of intent under MCL 168.737a. Michigan's various election requirements invariably impose some burden on the voter. However, as the Supreme Court noted in *Marston v Lewis*, 410 US 679, 680; 93 S Ct 1211; 35 L Ed 2d 627 (1973), "a person does not have a [state or] federal constitutional right to walk up to a voting place on election day and demand a ballot." Rather, Michigan has a compelling interest in ensuring that its election processes are honest, orderly, and efficient.

[50] According to an affidavit submitted by the Director of the Bureau of Driver and Vehicle Records for the Michigan Department of State, approximately 95 percent of registered voters in the state of Michigan already possess either a driver's license or a state identification card. Of the remaining five percent of registered voters, it is unknown how many possess "other generally recognized picture identification . . . ." As previously indicated, see n 23, the Secretary of State has not promulgated rules regarding what kind of "alternative" photo identification will satisfy this requirement.

reaching into one's purse or wallet and presenting photo identification before being issued a ballot imposes a severe burden on the right to vote.[51]

Rather, the opposing Attorney General maintains that the statute is facially unconstitutional because an impermissibly severe burden falls on those registered voters who, for whatever reason, do not possess the necessary photo identification. According to this argument, those without photo identification, particularly the "poor, racial and ethnic minorities, elderly, and the disabled," are unable to "gain free and unfettered access to the ballot box."[52] However, the statute explicitly provides that an elector without photo identification need only sign an affidavit in the presence of an election inspector before being "allowed to vote." The opposing Attorney General fails to explain why the act of signing an affidavit in lieu of presenting photo identification imposes a severe burden on the right to vote.[53] Surely, affixing a signature to such an affidavit is no greater a burden than affixing a signature to the required election application under MCL 168.523. Moreover, the affidavit alternative to the photo identification requirement imposes

---

[51] Historically, some mechanism of voter identification has been an integral part of the voting process. Harris, *Election Administration in the United States* (Brookings Institution Press, 1934), ch 6, pp 221-222.

[52] Opposing Attorney General brief, p 12.

[53] We have already considered and rejected the opposing Attorney General's argument that the challenge procedure delineated in MCL 168.727 is required to be applied to every voter who utilizes the affidavit alternative. All voters, without regard to whether they possess photo identification, face the *possibility* of challenge pursuant to the statute. See n 24 of this opinion.

*less* of a burden than is imposed on those voters who are required to execute a sworn statement before casting a provisional ballot.[54] While both voters are required to execute sworn statements, a provisional ballot "is not tabulated on election day";[55] instead, the ballot is not tabulated until the provisional voter's eligibility is verified within six days after the election.[56] There is simply no basis to conclude that requiring an elector to sign an affidavit as an alternative to presenting photo identification imposes a *severe* burden on the right to vote. Furthermore, the application of a "strict standard would be especially inappropriate in a case such as this, in which the right to vote is on both sides of the ledger."[57] This is so because fraudulent voting dilutes the vote of legitimate voters.[58]

The photo identification provision contained in MCL 168.523 imposes only a "reasonable, nondiscriminatory restriction" on the right to vote that is warranted by the precise interest identified by the state—Michigan's compelling regulatory

---

[54] A provisional ballot is cast when "an individual who is not listed on the voter registration list" seeks to cast a ballot. MCL 168.523a(2). HAVA requires that a voter sign a sworn statement as a condition of casting a provisional ballot. 42 USC 15482(a)(2); 42 USC 15483(b)(2)(B).

[55] MCL 168.523a(5).

[56] MCL 168.813(1). By contrast, a vote cast pursuant to the affidavit provision of MCL 168.523 is tabulated on the day of the election like every other vote.

[57] *Crawford v Marion Co Election Bd*, 472 F3d 949, 952 (CA 7, 2007).

[58] *Purcell, supra* 549 US at ___; 127 S Ct at 7; 166 L Ed 2d at 4-5.

interest in preventing voter fraud as well as enforcement of the constitutional directive contained in art 2, § 4 to "preserve the purity of elections" and "to guard against abuses of the elective franchise." The identification requirement applies evenhandedly to every registered voter in the state of Michigan without making distinctions with regard to any class or characteristic. In every circumstance, a registered voter need only take one of two actions in order to cast an in-person ballot–either present photo identification or sign an affidavit. The affidavit alternative is equally available to a voter who chooses not to obtain identification, a voter whose faith precludes him from obtaining photo identification, a voter who cannot obtain identification, or a voter who simply lost his identification.

Moreover, the statute is a reasonable means to *prevent* the occurrence of in-person voter fraud. As our Secretary of State has indicated, "without a personal identification requirement it is nearly impossible to detect in-person voter fraud."[59] In-person voter fraud is, by its very nature, covert.[60] In order to prevent in-person voter fraud, it is reasonable to require the person seeking to cast a ballot to provide

---

[59] Letter from Secretary of State Terri Lynn Land to Attorney General Michael A. Cox, dated April 20, 2006. See also *Crawford*, *supra* at 953, describing in detail the "extreme difficulty of apprehending a voter impersonator."

[60] See *Burson*, *supra* at 208. "Voter intimidation and election fraud are successful precisely because they are difficult to detect."

reliable identification that he is, in fact, the individual registered to vote.[61] The prevention of fraud in the first instance is critical, because it is impossible to remedy the harm inflicted by the fraudulently cast ballot by correcting the vote count, as our constitution requires that ballots remain secret.[62] Conducting the election anew is the only remedy available to purge the taint of a fraudulently cast ballot, a solution described as "imperfect" and having a "negative impact on voter turnout."[63]

The opposing Attorney General argues that MCL 168.523(1) fails even under a lower standard of scrutiny because in-person voter fraud "is very rare"; thus, the state's interest in preventing fraud is "illusory" because there is no significant evidence of in-person voter fraud.[64] Moreover, the opposing Attorney

---

[61] In-person voter fraud could include impersonation of a registered voter, casting a vote in the name of a deceased voter, or casting a vote in the name of a fictional registered voter.

[62] See Const 1963, art 2, § 4. In fact, a voter's ballot is required to be rejected if any part of the ballot is exposed to any person. MCL 168.738(2). If the voter's ballot is rejected for exposure, the "elector shall not be allowed to vote at the election." *Id.*

[63] *Burson*, *supra* at 209.

[64] Opposing Attorney General brief, pp 20, 21. See also Overton, *Voter identification*, 105 Mich L R 631 (2007) (urging on policy grounds that lawmakers await better empirical studies before imposing potentially antidemocratic measures and that the judiciary should demand statistical data.). Given that voter fraud is both covert and criminal, it is hard to imagine how an "empirical study" of the kind demanded by the opponents of voter identification requirements could be designed or executed.

General argues that the statute does nothing to address or prevent fraudulent absentee voting, "where fraud is known to exist." However, there is no requirement that the Legislature "prove" that significant in-person voter fraud exists before it may permissibly act to prevent it. The United States Supreme Court has explicitly stated that "elaborate, empirical verification of the weightiness of the State's asserted justifications" is *not required*.[65] Rather, a state is permitted to take prophylactic action to respond to potential electoral problems:

> To require States to prove actual [harm] as a predicate to the imposition of reasonable . . . restrictions would invariably lead to endless court battles over the sufficiency of the "evidence" marshaled by a State to prove the predicate. Such a requirement would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action. Legislatures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights.[66]

Therefore, the state is not required to provide *any* proof, much less "significant proof," of in-person voter fraud before it may permissibly take steps to prevent it.

Furthermore, the Legislature is not obligated under the Equal Protection Clause to address at once every point at which fraud might occur.[67] Even in the

---

[65] *Timmons*, *supra*, 520 US at 364.

[66] *Munro v Socialist Workers Party*, 479 US 189, 195-196; 107 S Ct 533; 93 L Ed 2d 499 (1986).

[67] The Equal Protection Clause "does not compel . . . legislatures to prohibit all like evils, or none." *United States v Carolene Products Co*, 304 US 144, 151; 58 S Ct 778; 82 L Ed 1234 (1938).

24

context of voting regulations, the Legislature is "allowed to take reform 'one step at a time,'" and is not required "to cover every evil that might conceivably have been attacked."[68] Rather, the Legislature is given the discretion to weigh the perceived harm and determine ameliorative priorities without running afoul of equal protection guarantees:[69]

> Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others. The prohibition of the Equal Protection Clause *goes no further* than the invidious discrimination.[70]

Because we conclude that the obligation imposed by the statute of either presenting photo identification or signing an affidavit is not a severe burden on the

---

[68] *McDonald v Chicago Bd of Election Comm'rs*, 394 US 802, 809; 89 S Ct 1404; 22 L Ed 2d 739 (1969) (citation omitted).

[69] The opposing Attorney General also argues that MCL 168.523(1) is not justified because "an effective framework for detecting and deterring voter fraud is already in place in Michigan." Opposing Attorney General brief, p 21. In support of this argument, counsel cites MCL 168.932a. This statute, which was enacted by 1996 PA 583, imposes criminal penalties for those who assume a fictitious name or impersonate another for the purposes of voting. However, that Michigan criminalizes in-person voter fraud does not address Michigan's undisputed interest in *preventing* fraud in the first instance, nor do criminal sanctions provide a means of *detecting* fraud. Moreover, it is unclear how the imposition of criminal penalties could remedy the harm inflicted on our electoral system by a fraudulently cast ballot.

[70] *Williamson v Lee Optical of Oklahoma, Inc*, 348 US 483, 489; 75 S Ct 461; 99 L Ed 563 (1955) (emphasis added; internal citations omitted).

right to vote, and that the statute imposes only a reasonable, nondiscriminatory restriction on the election process in furtherance of Michigan's compelling regulatory interest in preventing voter fraud and enforcing art 2, § 4 to "preserve the purity of elections" and "to guard against abuses of the elective franchise" by ensuring that lawful voters not have their votes diluted, we conclude that the statute is facially constitutional under the flexible standard articulated in *Burdick*, *supra*.

## ii. MICHIGAN CONSTITUTION

The opposing Attorney General argues that the Michigan Constitution grants a higher level of protection and that the "flexible test" articulated in *Burdick* is not consistent with Const 1963, art 1, § 2. First, the opposing Attorney General notes that, in contrast to its federal counterpart, the Michigan equal protection provision contains an express recognition of "political rights." Thus, counsel maintains that any regulation affecting "political rights" necessitates strict scrutiny analysis. Second, citing *Wilkins v Ann Arbor City Clerk*[71] and *Michigan State UAW Community Action Program Council v Secretary of State*,[72] the opposing Attorney General maintains that the Michigan Constitution requires that every law that applies even a *de minimis* burden on the right to vote must be analyzed under strict scrutiny.

---

[71] 385 Mich 670; 189 NW2d 423 (1971).

[72] 387 Mich 506; 198 NW2d 385 (1972).

26

While Const 1963, art 1, § 2 does contain the term "political rights," that term does not stand in isolation.[73] We have discovered no authority, and counsel has revealed none, holding that the term "political rights" has *ever* been interpreted as providing an unfettered right to vote divorced from any type of time, place, or manner restriction. Rather, reading the constitutional provision in context, it provides that no person shall be denied "the enjoyment of his civil or political rights or be discriminated against in the exercise thereof *because of* religion, race, color or national origin." (Emphasis added.) However, as the opposing Attorney General acknowledges in its brief, the distinction made in MCL 168.523(1) is between "those who possess photo identification and those who do not."[74] Nothing in the statute denies an elector the right to vote, and certainly does not do so *because of* religion, race, color, or national origin. Accordingly, Const 1963, art 1, § 2 provides no support for the claim that strict scrutiny must be applied to every election regulation.

---

[73] The term "political rights" is found in the nondiscrimination clause of art 1, § 2 rather than the Equal Protection Clause. Const 1963, art 1, § 2 states in full:

> No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation.

[74] Opposing Attorney General brief, p 8.

Likewise, the cases cited by the opposing Attorney General do not support the claim that the Michigan Constitution requires that every election law be subject to strict scrutiny review. In *Wilkins*, *supra*, this Court considered the constitutionality of MCL 168.11(b), a statute that precluded students from establishing residency for the purposes of voter registration. Previous caselaw construing the statute held that a student could register to vote by overcoming a rebuttable presumption that the student was not a resident in the locale of the institution of learning.[75] Relying *exclusively* on federal authority, *Wilkins* held that the statute violated both federal and state due process and equal protection provisions. The Court held that the statute violated due process because there were no consistently applied standards by which a student could overcome the presumption of nonresidency.

In its equal protection analysis, *Wilkins* held that strict scrutiny was the applicable review standard, noting that the "compelling interest test has been applied with one exception to all of the recent [federal] voting cases . . . ."[76] Rejecting the argument that an absolute denial of the right to vote was required to invoke strict scrutiny, the *Wilkins* Court held that strict scrutiny was appropriate because it was sufficient that the students could show "a burden" on their right to

[75] *Wolcott v Holcomb*, 97 Mich 361; 56 NW 837(1893); *People v Osborn*, 170 Mich 143; 135 NW 921 (1912); *Attorney General ex rel Miller v Miller*, 266 Mich 127; 253 NW 241 (1934).

[76] *Wilkins*, *supra* at 681.

28

vote.[77] Applying the heightened standard, the *Wilkins* Court declared the statutory provision unconstitutional because it was not necessary to advance the state's interest in "promoting a concerned and interested electorate" and in "insuring that students will not vote twice."[78]

In *Michigan State UAW, supra,* this Court considered the constitutionality of MCL 168.509. The statute required that electors who had not voted or taken other specified action within the previous two years have their voter registration suspended, unless the elector completed an "application for continuation," bearing the elector's signature, address, and mother's maiden name.[79] In resolving the case, the Court dealt "with only one issue"–whether the statute violated Const 1963, art 2, § 1 by imposing an additional voter qualification.[80] Inexplicably, the

---

[77] *Id.* at 684.

[78] *Id.* at 687, 685.

[79] *Michigan State UAW*, *supra* at 522 (Brennan, J., dissenting). A notice of suspension, along with the application for continuation, was mailed to the elector's address 30 days before the elector's registration was suspended.

[80] *Michigan State UAW, supra* at 513. Const 1963, art 2, § 1, provides:

> Every citizen of the United States who has attained the age of 21 years, who had resided in this state six months, and who meets the requirements of local residence provided by law, shall be an elector and qualified to vote in any election except as otherwise provided in this constitution. The legislature shall define residence for voting purposes.

*Michigan State UAW* Court utilized the strict scrutiny standard applicable in the equal protection context, art 1, § 2, in analyzing the art 2, § 1 question.[81]

In *Michigan State UAW*, the Attorney General argued that the statutory provision was permissible under art 2, § 4 of the Michigan Constitution, discussed *supra*. However, in analyzing this constitutional provision, the Court addressed only the Legislature's authority to provide for voter registration, and did not address the explicit directive to preserve the purity of elections and guard against abuses of the elective franchise. The Attorney General also argued that the act of returning the application for continuation was a "small price to pay." In response, the Court cited *Wilkins* and two United States Supreme Court cases in support of the conclusion that "[a]ny burden, however small, will not be permitted unless there is demonstrated a compelling state interest."[82] The Court concluded by holding that, because the Legislature had other statutes in place that served to prevent fraudulent voting, the state "failed to demonstrate a compelling state interest" and the statute was "unconstitutional under Const 1963, art 2, § 1," as adding an additional elector qualification.[83]

---

[81] In support of the application of strict scrutiny to art 2, § 1, a provision setting forth voter qualifications, the *Michigan State UAW* Court exclusively cited equal protection cases, including *Wilkins, supra.*

[82] *Michigan State UAW, supra* at 516.

[83] *Id.* at 520.

Properly read, neither *Wilkins* nor *Michigan State UAW* stands for the proposition that Michigan's Equal Protection Clause, in contrast to the federal Equal Protection Clause, requires the application of strict scrutiny review to every election law. *Wilkins* relied *exclusively* on United State Supreme Court jurisprudence in construing the Michigan equal protection provision as requiring the application of a strict scrutiny standard whenever "a burden" was placed on the right to vote. Notably, *nothing* in the *Wilkins* decision purported to differentiate between the state and federal equal protection provisions; rather, the provisions were read as coterminous for the purposes of the *Wilkins* analysis. However, as *Burdick* subsequently clarified, blanket application of strict scrutiny review to every election law was not constitutionally required under the federal Equal Protection Clause; rather, strict scrutiny review was constitutionally required *only* where an election law imposed a severe burden on the right to vote. Because *Wilkins* relied on a construction of the federal Equal Protection Clause that was subsequently repudiated by *Burdick*, its analytical underpinning has been destroyed and is of no utility in construing the Michigan Constitution.

Similarly, *Michigan State UAW* does not support the opposing Attorney General's claim that the Michigan Constitution requires strict scrutiny review of all election regulations. The *Michigan State UAW* opinion did not purport to examine or rely on the Michigan Equal Protection Clause in its analysis *at all*. At issue in *Michigan State UAW* was the constitutionality of a voter registration regulation. It is unclear why the Court analyzed the voter registration regulation as

31

an elector qualification issue under art 2, § 1, because the Legislature unquestionably possesses explicit constitutional authority over voter registration pursuant to art 2, § 4.[84] Regardless, the Court borrowed the strict scrutiny standard, a doctrine rooted in equal protection principles, and applied it to the issue of whether a voter registration provision imposed an additional elector qualification under art 2, § 1.[85]

Of significance, neither *Wilkins* nor *Michigan State UAW* considered or examined the effect of the constitutional directive found in art 2, § 4, requiring the

---

[84] Const 1963, art 2, § 1 sets forth the minimum characteristics that electors must possess before they become qualified to vote "except as otherwise provided"—citizenship, age, and residency. Const 1963, art 2, § 4 vests in the Legislature the exclusive authority to regulate the time, place, and manner of elections, as well as the authority to provide for a system of voter registration. Thus, contrary to Justice Kelly's assertions, *both* constitutional provisions play a vital and necessary role in a citizen's right to cast a ballot on election day.

[85] Justice Kelly also relies on *Socialist Workers Party v Secretary of State*, 412 Mich 571; 317 NW2d 1 (1982), to argue that Const 1963, art 1, § 2 requires strict scrutiny. However, *Socialist Workers Party* never concludes that the Michigan Constitution independently requires strict scrutiny. Instead, this Court determined that strict scrutiny would apply under the First and Fourteenth amendments of the federal constitution, citing federal caselaw. See *id*. at 587-590. After concluding that the law at issue violated the First and Fourteenth amendments, this Court summarily held that art 1, § 2 had been violated as well, relying on the "'frequent past expressions of this Court that the Michigan Constitution "secures the same right of equal protection" as is secured by the Equal Protection Clause of the Fourteenth Amendment.'" *Id*. at 600 n 21, quoting *Governor v State Treasurer*, 390 Mich 389, 395; 212 NW2d 711 (1973) (T.G. Kavanagh, J., concurring), quoting *Fox v Employment Security Comm*, 379 Mich 579, 588; 153 NW2d 644 (1967). Because *Socialist Workers Party* expressly stated that it did not rely on the independent force of the Michigan Constitution, *Socialist Workers Party* does not indicate that art 1, § 2 requires strict scrutiny.

Legislature to "enact laws to preserve the purity of elections" and to "guard against abuses of the elective franchise." This oversight is of critical importance, because "every [constitutional] provision must be interpreted in the light of the document as a whole . . . ."[86] Because our constitutional provisions "'are of equal dignity,'"[87] having been adopted simultaneously, "'neither can logically trump the other.'"[88] Therefore, every effort should be made to construe constitutional provisions harmoniously, and no provision "should be construed to nullify or impair another."[89]

Thus, as noted above, the Michigan Constitution does not compel that every election regulation be reviewed under strict scrutiny. Given that the appropriate standard by which to evaluate election laws must be compatible with our *entire* constitution, and must not nullify or impair any other constitutional provision, we adopt the "flexible test" articulated in *Burdick* when resolving an equal protection challenge to an election law under the Michigan Constitution.

---

[86] *Lapeer Co Clerk* v *Lapeer Circuit Court*, 469 Mich 146, 156; 665 NW 2d 452 (2003). See also *Sault Ste Marie City Comm* v *Sault Ste Marie City Attorney*, 313 Mich 644; 21 NW2d 906 (1946); *City of Lansing* v *Ingham Co Clerk*, 308 Mich 560; 14 NW2d 426 (1944).

[87] *In re Probert*, 411 Mich 210, 232-233 n 17; 308 NW2d 773 (1981) (citation omitted).

[88] *Straus v Governor*, 459 Mich 526, 533; 592 NW2d 53 (1999) (citation omitted).

[89] *Lapeer Co Clerk, supra* at 156.

The *Burdick* test strikes the appropriate balance between protecting a citizen's right to vote under art 1, § 2 and protecting against fraudulent voting under art 2, § 4.[90] Therefore, where an election law subjects the right to vote to "severe restrictions," strict scrutiny review is applicable, and the regulation must be narrowly drawn to advance a compelling state interest.[91] However, when an election law imposes only "reasonable, nondiscriminatory restrictions" on the right to vote, the law is upheld as advancing the important regulatory interest identified by the state. As we have previously concluded, MCL 168.523(1) does not impose a severe burden on the right to vote; rather, it imposes only a reasonable, nondiscriminatory restriction that furthers Michigan's compelling regulatory interest in preventing voter fraud as well as enforcing the constitutional directive contained in art 2, § 4 to "preserve the purity of elections" and "to guard against abuses of the elective franchise" by ensuring that lawful voters not have their votes diluted. Therefore, the statute is valid under the Michigan Constitution.

### V. MCL 168.523(1) IS NOT AN UNCONSTITUTIONAL POLL TAX

The opposing Attorney General argues that by requiring voters to purchase a state-issued identification card, MCL 168.523(1) is "tantamount to a poll tax,"

---

[90] Contrary to Justice Kelly's assertions, we are not "simply follow[ing] federal precedent in lockstep." *Post* at 34. As the preceding analysis demonstrates, we have carefully considered the requirements of art 1, § 2 in light of art 2, § 4, and determined that the test enunciated in *Burdick* gives proper meaning and effect to both constitutional provisions. Justice Kelly, on the other hand, fails to adequately address the impact of art 2, § 4.

[91] *Burdick*, *supra* at 434.

and violates the Twenty-fourth Amendment of the United States Constitution. US Const, Am XXIV provides:

> The right of citizens of the United States to vote in any primary or other election . . . shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax.

The opposing Attorney General argues that the fee charged by the Secretary of State to obtain a state identification card ($10) or a driver's license ($25) constitutes an impermissible poll tax. Moreover, counsel argues that the "real costs" incurred in obtaining photo identification are "much higher," and are properly considered when determining whether the statute imposes an unconstitutional poll tax. Such "real costs" include the cost of transportation to reach the local Secretary of State office, the cost of taking time off work to go to the Secretary of State office, and the cost of procuring supporting documentation necessary to obtain state-issued photo identification, such as a copy of a birth certificate.

The seminal case concerning poll taxes is *Harper v Virginia Bd of Elections*.[92] There, the United States Supreme Court struck down a Virginia law that imposed an annual poll tax of $1.50 on every resident over the age of 21 as "a precondition for voting."[93] Virginia argued that if it could "demand from all an

---

[92] 383 US 663; 86 S Ct 1079; 16 L Ed 2d 169 (1966).

[93] *Id*. at 665 n 1.

equal fee for a driver's license," then it could "demand from all an equal poll tax for voting."[94] The Court held that the Virginia law was unconstitutional because the law made "the affluence of the voter or payment of any fee an electoral standard."[95] Regarding any "familiar form of taxation," the *Harper* Court stated the opinion did nothing to "impair its validity so long as" payment of fees is not "made *a condition to the exercise* of the franchise."[96]

In *Harman v Forssenius*,[97] the Court considered the constitutionality of a Virginia law that required, as a condition of voting, an elector to either pay a poll tax or file an annual certificate of residence no later than six months before the election. Holding that the Twenty-fourth Amendment prohibited "'onerous procedural requirements which effectively handicap exercise of the franchise,'"[98] the Court struck down the certificate of residence requirement because it imposed "a real obstacle to voting" for those "who assert their constitutional exemption

---

[94] *Id*. at 668.

[95] *Id*. at 666.

[96] *Id.* at 669 (emphasis added). The *Harper* opinion overruled *Breedlove v Suttles*, 302 US 277; 58 S Ct 205; 82 L Ed 252 (1937), where the Court had previously held that it was constitutionally permissible "[t]o make payment of poll taxes a prerequisite of voting . . . ." *Id.* at 283.

[97] 380 US 528; 85 S Ct 1177; 14 L Ed 2d 50 (1965).

[98] *Id*. at 541 (citation omitted).

from the poll tax."[99]  The Court noted that the certificate of residence had to be filed every election year, at least six months before the election, and had to be witnessed or notarized.  Unlike poll tax bills, which were sent directly to a voter's residence,  a certificate of residence had to be obtained from local officials or prepared by the voter, and filed "in person, or otherwise" with the city or county treasurer.  The Court noted that the statute imposed "a cumbersome procedure," and that it seemed "far preferable to mail in the poll tax payment upon receipt of the bill."[100]

In this case, MCL 168.523(1) is not an unconstitutional poll tax under *Harper* because the statute does not condition the right to vote on the payment of any fee.  A voter who does not otherwise possess adequate photo identification is not required to incur the costs of obtaining photo identification as a condition of voting.  Instead, a voter may simply sign an affidavit in the presence of an election inspector.  Nothing in the statute contemplates that a voter is required to incur any costs in the execution of an affidavit.

Moreover, the statute is not unconstitutional under *Harman* because signing an affidavit in the presence of an election inspector, as an alternative to presenting photo identification, is simply not an onerous procedural requirement that handicaps the exercise of the franchise.  The procedure in MCL 168.523 bears no

---

[99] *Id*.

[100] *Id*. at 541, 542.

resemblance to the "cumbersome procedure" depicted in *Harman*. Fulfilling the requirement of MCL 168.523(1) requires only as much penmanship as is necessary to execute the affidavit, which is readily available at the election precinct. In *Harman*, the fact that the residency certificate was required to be "filed six months before the election" was significant, because such a requirement "perpetuat[es] one of the disenfranchising characteristics of the poll tax which the Twenty-fourth Amendment was designed to eliminate."[101] Here, there is no requirement that an affidavit be executed in advance of the election; rather, an affidavit is executed on the day of the election. Because MCL 168.523(1) does not "erect[] a real obstacle to voting,"[102] there is no constitutional infirmity under *Harman*.

Although no voter is ever *compelled* to procure photo identification as a condition for exercising his right to vote under the statute, we observe that our law provides a mechanism for some voters to receive a state identification card at no cost. Our law requires that the Secretary of State waive the customary fee for a state identification card if an applicant meets any of the conditions listed in MCL 28.292(14).[103] Thus, any voter who *elects* to obtain photo identification for use at

---

[101] *Harman*, *supra* at 542.

[102] *Id.* at 541.

[103] MCL 28.292 (14) provides:

(continued…)

the polls is entitled to have the $10 fee waived entirely if he is elderly, disabled, or presents good cause to have the fee waived. Therefore, many of the categories of voters that the opposing Attorney General claims are disproportionately affected by the cost of procuring the entirely *optional* photo identification can in fact obtain it for free.[104]

Regarding the secondary costs cited by the opposing Attorney General— time, transportation, and the expense of procuring supporting documentation—we

---

(…continued)
> The secretary of state shall waive the fee under this section if the applicant is any of the following:
>
> (a) A person 65 years of age or older.
>
> (b) A person who has had his or her operator's or chauffeur's license suspended, revoked, or denied under the Michigan vehicle code, 1949 PA 300, MCL 257.1 to 257.923, because of a mental or physical infirmity or disability.
>
> (c) A person who presents evidence of statutory blindness as provided in 1978 PA 260, MCL 393.351 to 393.368.
>
> (d) A person who presents other good cause for a fee waiver.
>
> (e) Beginning January 1, 2007, a person who wishes to add or remove a heart insignia described in subsection (1)(f).

[104] Additionally, the elderly and the disabled are entitled to cast absentee ballots pursuant to MCL 168.758(1), alleviating the need to vote at an election precinct and either present photo identification or execute an affidavit.

agree with the reasoning of the United States District Court for the Southern

District of Indiana in rejecting a similar poll tax claim: [105]

> This argument represents a dramatic overstatement of what fairly constitutes a "poll tax." It is axiomatic that "(e)lection laws will invariably impose some burden upon individual voters." Thus, the imposition of tangential burdens does not transform a regulation into a poll tax. Moreover, the cost of time and transportation cannot plausibly qualify as a prohibited poll tax because these same "costs" also result from voter registration and in-person voting requirements, which one would not reasonably construe as a poll tax. Plaintiffs provide no principled argument in support of this poll tax theory.[106]

Noting that the "only incidental cost which might plausibly approach being a poll

tax is the fee assessed to obtain a birth certificate," the *Rokita* Court ultimately

rejected the claim because the birth certificate fees were not "sufficiently tied to

---

[105] *Indiana Democratic Party v Rokita*, 458 F Supp 2d 775, 827 (SD Ind, 2006) (internal citation omitted), aff'd sub nom *Crawford v Marion Co Election Bd*, 472 F3d 949 (CA 7, 2007).

In *Rokita*, the Indiana statute at issue required a voter to present valid photo identification issued either by the federal government or the state of Indiana. In the event a voter did not possess the requisite identification, the voter was required to be challenged, and could only cast a provisional ballot after executing an affidavit. In order to have the provisional ballot counted, the voter was required to provide proof of identity by noon on the second Monday following the election.

[106] We acknowledge that in *Common Cause/Georgia v Billups*, 406 F Supp 2d 1326, 1370 (ND Ga, 2005), the court held that a statute requiring voter photo identification constituted a poll tax because a voter had to "arrange for transportation," wait in line, and sign a fee waiver affidavit that "may require the voter to swear or affirm to facts that simply are not true" in order to obtain photo identification at no cost. However, less than one year later, the same federal judge adopted the poll tax analysis of *Rokita*, thereby undercutting the prior holding *sub silentio*. See *Common Cause/Georgia v Billups*, 439 F Supp 2d 1294, 1354-1355 (ND Ga, 2006).

the requirements of voting as to constitute a 'poll tax.'"[107] Where, as here, even less of a burden is imposed on voters, since no voter need ever incur any secondary costs because of the affidavit alternative contained in MCL 168.523. Therefore, any incidental costs incurred by a voter who elects to obtain the optional identification card cannot be held to constitute a "poll tax."

## VI. RESPONSE TO THE DISSENTS

We are content to rest on the strength of the constitutional analysis we have made, but pause here briefly to address some of the more inflammatory and emotional arguments made in Justice Cavanagh's dissent.[108] It is clear that he passionately dislikes the enacted voter photo identification requirement and believes it to be "ill-advised" and founded on no empirical data showing that Michigan has a voter fraud problem. Whether the statute is an "ill-advised" *policy choice* is not a judgment open to the judiciary, this Court, or any member of it. For the reasons we have stated, whatever its policy merits, this enacted legislative policy choice is not one that is facially unconstitutional as the dissenters maintain. We turn now to some of the specific emotional arguments advanced by the dissent.

---

[107] *Rokita, supra* at 827, 828. The *Rokita* court noted that the plaintiff had "provided no evidence" that anyone would actually have to incur the costs of obtaining a birth certificate in order to obtain identification. Moreover, other forms of documentation that could be used to obtain photo identification were issued by the federal government, whose requirements and incidental fees were outside the control of the state.

[108] Because the arguments made in Justice Kelly's dissenting opinion overlap with the arguments made in Justice Cavanagh's opinion, there is no need to address her arguments separately unless otherwise indicated.

41

## A. MICHIGAN HAS NO VOTER FRAUD PROBLEM

The interest in this case is more accurately presented as preventing *in-person* voter fraud when there is *no* evidence that *in-person* fraud actually exists.[109]

The sting of the dissent's contention here is that the photo identification statute serves *no* purpose and therefore surely cannot serve a constitutionally significant one that could justify even the slightest burden that it might impose on a Michigan voter. Not even the opposing Attorney General argues that "no evidence" of such voter fraud exists; the opposing Attorney General suggests only that in-person voter fraud is "rare."[110] However, whether the incidence of in-person voter fraud is believed to be rare or frequent, the fact of the matter is that no voter identification was required before the enactment of MCL 168.523 and no one knows—or could possibly know—the frequency with which in-person voter fraud occurs at the polls.[111] More relevant to our constitutional inquiry is the fact that a legislature—particularly one given a constitutional mandate to "preserve the

---

[109] *Post* at 13 (emphasis in original). See also Justice Kelly's dissent, post at 16. ("[T]hose arguing in favor of the photo identification requirements have not come forward with any documented instances of in-person voter fraud.").

[110] Interestingly, amicus curiae supporting the constitutionality of the statute have presented certified death certificates of 46 persons who "voted" in the November 2004 election, despite the ordinarily indisposing condition of being dead at the time. All these persons died well in advance of the election, with dates of death ranging from 16 months to more than 12 years prior to the November 2004 election. A surprising number of these deceased "voters" apparently voted at their precinct.

[111] See n 59 of this opinion.

purity of elections"—is not required to wait for an electoral calamity before it may act to fulfill its obligation to preserve.[112]  And while the dissent purports to focus on the *right* to vote, it does so by considering only one side of that right without reckoning with the obvious object of art 2, § 4—that the right to vote includes the assurance that one's vote will not be diluted by the votes of fraudulent voters.  The statute at issue is clearly designed to promote this state constitutional value by requiring those who desire to cast in-person ballots to present identification establishing that they are the registered voters who they claim to be.

## B. THE STATUTE IMPOSES A SEVERE BURDEN

> The reality is that not all of our citizens live a life in which they have photo identification and obtaining photo identification solely to vote causes a severe burden.[113]

In a statutory regime that *compels* the state to issue free Michigan photo identification to its disabled, its senior, and its most impecunious citizens,[114] the dissent's argument that the photo identification statute imposes a *severe* burden on anyone is simply facetious.  But the argument is even more wrongheaded on another ground:  Under this statute, no one need have or present photo

---

[112] *McDonald v Chicago Bd of Election Comm'rs, supra* n 68.

[113] *Post* at 20.

[114] See n 100 of this opinion.

43

identification at the poll; a voter need only *sign an affidavit* to vote and have that vote counted like those of every other voter appearing at the polls.[115]

Justice Cavanagh contends that the ability of voters without photo identification to sign an affidavit in order to vote does not lessen the burden imposed by MCL 168.523 because a "likely scenario is that the challenge process will be used in some situations to harass and intimidate citizens" who sign an affidavit.[116] Although he conjures up images of voters being denied their right to vote at the whim of election officials, he ignores the clear statutory prohibition against such harassment in MCL 168.727(3), which provides that "[a] challenger shall not make a challenge indiscriminately and without good cause." Moreover, a person who challenges a voter for the purpose of annoyance or delay is guilty of a misdemeanor. Thus, contrary to the assertions of Justice Cavanagh, the use of the challenge process to harass voters is deterred by subjecting the challenger to

---

[115] While Justice Kelly maintains that the "affidavit option itself" "interferes" with the right to vote, *post* at 13, she does not explain how the "minor obstacle" of signing one's signature is any different that affixing a signature to the required election application under MCL 168.523. Justice Kelly also suggests that "signature matching" would be a "less restrictive alternative" than either showing photo identification or signing an affidavit. *Post* at 17. However, it should be noted that signature matching necessarily requires a signature, and does not obviate the necessity of confirming that the person at the poll is the person he claims to be. Thus, it would appear that Justice Kelly objects to the legislative choice in determining the identity of a potential voter.

[116] *Post* at 31.

criminal penalties.  For these reasons, the dissent errs by concluding that MCL

168.523 imposes a severe burden on the right to vote.

### C. THE STATUTE WILL HAVE A DISPARATE IMPACT ON MINORITIES

> The photo identification requirement will have a disparate impact on racial and ethnic populations, as well as poor voters, elderly voters, and disabled voters . . . [T]he statute at issue will diminish the opportunity for thousands of citizens to participate in the political process.[117]

When all other arguments are unavailing, resorting to a claim of racial

discrimination is a frequent substitute.  Unfortunately, the Justice Cavanagh has

chosen this tack.[118]

Since the act of signing one's name to an affidavit is too trivial an act to

sustain the weight of Justice Cavanagh's overwrought burden argument, he has

been forced to ignore the fact that this case involves a *facial* challenge to the

statute and argues that the statute, *as it will be applied in the future*, will be subject

to abuses that will be discriminatorily visited upon some Michigan citizens.[119]  We

simply note that, whatever may happen once the statute is enforced, our task in

*this* case is to determine only whether the statute is capable of *any* valid

---

[117] *Id*. at 21.

[118] Indeed, Justice Cavanagh appears to have come perilously close to suggesting that the Legislature was motivated in enacting this statute by the desire to suppress minority voters. *Post* at 13-15.

[119] *Post* at 19-23.

application.[120]  We conclude that it passes constitutional muster under a facial challenge because the voter photo identification statute imposes no significant, much less "severe," burden on Michigan's voters.

## VII. CONCLUSION

In this advisory opinion, we have carefully considered the arguments advanced by the Attorney General both challenging and defending the constitutionality of 2005 PA 71.  For the reasons previously articulated, the photo identification requirement in MCL 168.523(1) is facially constitutional and withstands scrutiny under both the Michigan Constitution and the United States Constitution.  Under the balancing test articulated by *Burdick, supra,* the photo identification requirement is a reasonable, nondiscriminatory restriction designed to preserve the purity of elections and to prevent abuses of the electoral franchise, as demanded by art 2, § 4 of the Michigan Constitution, thereby ensuring that lawful voters not have their votes diluted.  Moreover, because no voter is required to incur the costs of obtaining a photo identification card as a condition of voting, the statute does not impose the payment of a fee as "a condition to the exercise of

---

[120] See *Steffel* cited in n 20 of this opinion. Should it occur that the statute is discriminatorily applied when it is enforced, the constitutionality of its enforcement will then be at issue and can be challenged at that time.

the franchise"[121] and therefore is not an unconstitutional poll tax under the Twenty-fourth Amendment of the United States Constitution.

> Robert P. Young, Jr.
> Clifford W. Taylor
> Elizabeth A. Weaver
> Maura D. Corrigan
> Stephen J. Markman

---

[121] *Harper*, *supra* at 669.

S T A T E   O F   M I C H I G A N

SUPREME COURT

*In re* REQUEST FOR ADVISORY
OPINION REGARDING
CONSTITUTIONALITY OF 2005 PA 71                    No. 130589

_____

CAVANAGH, J. (*dissenting*).

This case is not about preventing voter fraud, it is not about thwarting abuses of the electoral franchise, and it is certainly not about preserving the purity of elections. This case is simply about protecting the right to vote for all Michigan citizens. As our Michigan Constitution provides: "All political power is inherent in the people. Government is instituted for their equal benefit, security and protection." Const 1963, art 1, § 1. Today's decision ignores this constitutional principle and endorses misguided legislation that significantly impairs the fundamental right of thousands of our citizens to vote. The statute at issue and the majority's approval of this statute ignore the fact that the government does not bestow the right to vote on our citizens. The right to vote is inherent, and the government's role is simply to protect this right. Today, our government has failed its citizens. Because I believe this ill-advised legislation is unconstitutional, I respectfully dissent.

## I. THE RIGHT TO VOTE IS FUNDAMENTAL

"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v Sanders*, 376 US 1, 17; 84 S Ct 526; 11 L Ed 2d 481 (1964). "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v Sims*, 377 US 533, 555; 84 S Ct 1362; 12 L Ed 2d 506 (1964); see also *Kramer v Union Free School Dist No 15*, 395 US 621, 626; 89 S Ct 1886; 23 L Ed 2d 583 (1969). The fundamental right to vote encompasses the right to actually have those votes counted. *Reynolds*, *supra* at 554. In Michigan, our citizens' right to vote is protected by the Michigan Constitution, as well as the Equal Protection Clause of the United States Constitution.[1]

---

[1] Our Michigan Constitution provides:

> Every citizen of the United States who has attained the age of 21 years, who has resided in this state six months, and who meets the requirements of local residence provided by law, shall be an elector and qualified to vote in any election except as otherwise provided in this constitution. The legislature shall define residence for voting purposes. [Const 1963, art 2, § 1.]

Under the United States Constitution, the voting age requirement has been changed to 18 years. US Const, Am XXVI.

(continued…)

This Court has long recognized that the "right to vote has always received a preferred place in our constitutional system. The importance of this right cannot be overemphasized. It is the basic protection that we have in insuring that our government will truly be representative of all of its citizens." *Michigan State UAW Community Action Program Council v Secretary of State*, 387 Mich 506, 514; 198 NW2d 385 (1972). "[T]he right to vote is accorded extraordinary treatment because, it is, in equal protection terms, an extraordinary right: a citizen cannot hope to achieve any meaningful degree of individual political equality if granted an inferior right of participation in the political process." *Plyler v Doe*, 457 US 202, 233; 102 S Ct 2382; 72 L Ed 2d 786 (1982) (Marshall, J. concurring). While the state has the authority to regulate elections pursuant to Const 1963, art

---

(…continued)

The Equal Protection Clause of the Michigan Constitution provides, in relevant part, the following:

No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. [Const 1963, art 1, § 2.]

The Equal Protection Clause of the United States Constitution provides:

No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. [US Const, Am XIV, § 1.]

2, § 4, the state cannot pass a law that violates the Equal Protection Clause. See

*Williams v Rhodes*, 393 US 23, 29; 89 S Ct 5; 21 L Ed 2d 24 (1968).

This Court has been asked to issue an advisory opinion pursuant to Const 1963, art 3, § 8, addressing the constitutionality of § 523 of 2005 PA 71, which requires voters to provide an official state identification card, a driver's license, or other generally recognized picture identification card to vote. The statute also provides that a voter who does not have one of these forms of identification must sign an affidavit to that effect before being allowed to vote. The statute provides, in relevant part, the following:

> (1) At each election, before being given a ballot, each registered elector offering to vote shall identify himself or herself by presenting an official state identification card issued to that individual . . . , an operator's or chauffeur's license issued to that individual . . . , or other generally recognized picture identification card and by executing an application showing his or her signature or mark and address of residence in the presence of an election official. If an elector's signature contained in the qualified voter file is available in the polling place, the election official shall compare the signature upon the application with the digitized signature provided by the qualified voter file. If an elector's signature is not contained in the qualified voter file, the election official shall process the application in the same manner as applications are processed when a voter registration list is used in the polling place. If voter registration lists are used in the precinct, the election inspector shall determine if the name on the application to vote appears on the voter registration list. If the name appears on the voter registration list, the elector shall provide further identification by giving his or her date of birth or other information stated upon the voter registration list. In precincts using voter registration lists, the date of birth may be required to be placed on the application to vote. If the signature or an item of information does not correspond, the vote of the person shall be challenged, and the same procedure shall be followed as provided in this act for the challenging of an elector. If the person offering to vote has signed the registration card or application by

making a mark, the person shall identify himself or herself by giving his or her date of birth, which shall be compared with the date of birth stated upon the registration card or voter registration list, or shall give other identification as may be referred to upon the registration card or voter registration list. If the elector does not have an official state identification card, operator's or chauffeur's license as required in this subsection, or other generally recognized picture identification card, the individual shall sign an affidavit to that effect before an election inspector and be allowed to vote as otherwise provided in this act. However, an elector being allowed to vote without the identification required under this subsection is subject to challenge as provided in section 727. [MCL 168.523.]

A photo identification requirement was previously passed by the Legislature in 1996, but the Attorney General issued an opinion that the photo identification requirement in 1996 PA 583 violated the Equal Protection Clause of the Fourteenth Amendment. OAG, 1997-1998, No 6930, p 1 (January 29, 1997). The legislation passed in 1996 was identical in every relevant respect to the legislation at issue in this case, and the photo identification requirement has not been enforced since that time.

The Attorney General stated: "For the poor, those who do not drive, especially the elderly, the handicapped and those who, for whatever reason, do not possess a picture identification card, this requirement imposes economic and logistical burdens." *Id*. at 3. The Attorney General acknowledged that the prevention of voter fraud is, of course, a valid governmental interest, but the prevention of nonexistent voter fraud did not survive the required strict constitutional scrutiny. The Attorney General stated that "as the chief law enforcement official of the State of Michigan, I am not aware of any substantial

5

voter fraud in Michigan's elections.  I have not received complaints regarding voter fraud."  *Id.*  The Attorney General also relied on confirmation from the state's chief elections official, then-Secretary of State Candice Miller, for further evidence of the fact that Michigan does not have a voter fraud problem.  *Id.*  The Attorney General concluded that because the state of Michigan does not have an issue with voter fraud, the photo identification requirement "is simply not necessary to promote a compelling governmental interest."  *Id.*  Thus, because the photo identification requirement was not necessary to promote a compelling governmental interest and it denied the right to vote to our state's citizens, the earlier statute that required photo identification to vote was never implemented.

## II. THE PHOTO IDENTIFICATION REQUIREMENT IMPOSES A SEVERE BURDEN ON MICHIGAN'S CITIZENS

The photo identification requirement violates the Equal Protection Clause because it unduly burdens our citizens' right to vote.  As this Court has stated, any law that affects elections places a burden on the right to vote.  *Michigan State UAW*, *supra* at 516.  The United States Supreme Court has also held that when a statute places a condition on the exercise of the right to vote, an exacting test is required.  *Dunn v Blumstein*, 405 US 330, 337; 92 S Ct 995; 31 L Ed 2d 274 (1972).  If a challenged statute grants the right to vote to some citizens and denies the right to vote to other citizens, the court must determine whether the exclusions are necessary to promote a compelling state interest.  *Id.*  "Any burden, however small, will not be permitted unless there is demonstrated a compelling state

6

interest." *Michigan State UAW*, *supra* at 516, citing *Lane v Wilson*, 307 US 268, 275-277; 59 S Ct 872; 83 L Ed 1281 (1939). When restrictions are enacted on the basis of race or wealth, the restriction is highly suspect and demands exacting judicial scrutiny. *McDonald v Bd of Election Comm'rs of Chicago*, 394 US 802, 807; 89 S Ct 1404; 22 L Ed 2d 739 (1969). Notably, the Equal Protection Clause "guards against subtle restraints on the right to vote, as well as outright denial." *Wilkins v Ann Arbor City Clerk*, 385 Mich 670, 684; 189 NW2d 423 (1971).

To determine whether a restriction indeed compels strict scrutiny, the extent to which a requirement burdens a citizen's rights must be examined. *Burdick v Takushi*, 504 US 428, 434; 112 S Ct 2059; 119 L Ed 2d 245 (1992). When a restriction is reasonable and nondiscriminatory, the state's important regulatory interests are generally sufficient to justify the restriction. *Id*. But when a restriction is severe, the regulation must be narrowly tailored to advance only a compelling governmental interest. *Id*.; see also *Illinois Bd of Elections v Socialist Workers Party*, 440 US 173, 184; 99 S Ct 983; 59 L Ed 2d 230 (1979). When a statute will deny some citizens the right to vote, the general presumption of constitutionality is not applicable. *Kramer*, *supra* at 628. "The presumption of constitutionality and the approval given 'rational' classifications in other types of enactments are based on an assumption that the institutions of state government are structured so as to represent fairly all the people." *Id*. But "when the challenge to the statute is in effect a challenge of this basic assumption, the assumption can no longer serve as the basis for presuming constitutionality." *Id*.

7

While *Kramer* dealt with legislation that explicitly denied certain citizens the right to vote in school district elections, this fundamental premise is equally as sound in the case before us. The challenge to the photo identification requirement is that it will disproportionately deny the right to vote to racial and ethnic populations, as well as to the elderly, the poor, and citizens who are disabled. The government—which should be the voice of fairness in providing protection to all citizens—is the very entity that has enacted the legislation that is allegedly discriminatory. The government cannot now shield itself from strict scrutiny because it provides only a purported rational basis for the requirement while simultaneously failing to provide *any* evidence to support its purported rationale. Our Legislature—even one that has been fairly elected—"can exclude a minority of voters from any voice in the decisions just as effectively as if the decisions were made by legislators the minority had no voice in selecting." *Id.*

"[T]he State is itself controlled by the political party or parties in power, which presumably have an incentive to shape the rules of the electoral game to their own benefit." *Clingman v Beaver*, 544 US 581, 603; 125 S Ct 2029; 161 L Ed 2d 920 (2005) (O'Connor, J., concurring); see also *Tashjian v Republican Party of Connecticut*, 479 US 208, 225; 107 S Ct 544; 93 L Ed 2d 514 (1986) (The Court recognized that the interests of the state represented, to some extent, the views of the one political party enjoying majority power.). Recognizing the basic fact that the government is not always wholly independent and unbiased does not mean that reasonable and genuinely neutral and *necessary* requirements cannot be

8

imposed. But it does mean that an intellectually honest examination of a requirement must begin with recognizing this basic political fact and examining what role this has played in the enactment of the requirement at issue. See, e.g., *Crawford v Marion Co Election Bd*, 472 F3d 949, 954 (CA 7, 2007) (*Crawford I*) (Evans, J., dissenting). As requirements "become more severe, however, and particularly where they have discriminatory effects, there is increasing cause for concern that those in power may be using electoral rules to erect barriers to electoral competition." *Clingman*, *supra* at 603 (O'Connor, J., concurring).[2]

"[W]here fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined." *Harper v Virginia Bd of Elections*,

_____

[2] The majority claims that I "come perilously close to suggesting that the Legislature was motivated in enacting this statute by the desire to suppress minority voters." *Ante* at 45 n 118. Yet I advocate no such position. The majority distorts my view because it believes that this will have the most shock value and because it has no response for the realistic position that I do espouse. When a political party—*any* political party—is in power and enacts legislation that will affect our citizens' fundamental right to vote, it is the job of the courts to realistically examine the legislation, if it is challenged, to determine the effect it will have on our citizens. If those who are likely to be negatively affected are viewed as often not voting for the party in power, that is certainly one factor that *must* be considered. This is not a shocking principle; it is a rational one. The majority chooses to pretend that it is a scandalous concept that political motivations may actually affect the legislative votes of *politicians*. Yet this is a basic concept that I think few reasonable people, including our elected officials, would even try to counter. This does not mean that the Legislature acted with any untoward motivations when enacting this statute, but it does mean that a reasonable person should not be blind to considering the possibility that politics may have played a role. One need only look at the continued inquiries being made on the national level to see the disingenuous nature of the position being taken by the majority.

383 US 663, 670; 86 S Ct 1079; 16 L Ed 2d 169 (1966). Thus, to determine if a law violates the Equal Protection Clause, the court must weigh the character and magnitude of the burden caused against the interests that justify the burden. See *Timmons v Twin Cities Area New Party*, 520 US 351, 358; 117 S Ct 1364; 137 L Ed 2d 589 (1997). Specifically, the court looks at three areas: "[T]he character of the classification in question; the individual interests affected by the classification; and the governmental interests asserted in support of the classification." *Dunn*, *supra* at 335. In examining the character of the classification, the court must consider the facts and circumstances behind the law. *Williams*, *supra* at 30. While there is no bright-line test to separate permissible election-related regulations from unconstitutional infringements on our citizens' right to vote, the court must consider the extent to which the state's concerns make the burden necessary. *Timmons*, *supra* at 358. But "[t]he power to regulate the time, place, and manner of elections does not justify, without more, the abridgement of fundamental rights, such as the right to vote . . . ." *Tashjian*, *supra* at 217. Because voting involves the assertion of a fundamental constitutional right and this case deals with the actual right to vote, and not merely a minor regulation regarding the time, place, or manner of elections, the compelling state interest test must be applied. See *Wilkins*, *supra* at 681. Thus, if the state is unable to demonstrate a compelling interest for the significant impairment it seeks to implement, then the statute must be deemed unconstitutional. *Id*. at 682.

The majority purports that "the state is not required to provide *any* proof, much less 'significant proof,' of in-person voter fraud before it may permissibly take steps to prevent it." *Ante* at 24. But the majority ignores a critical aspect of the caselaw it cites. A state can respond to a potential deficiency *only if* "the response is reasonable and does not significantly impinge on constitutionally protected rights." *Munro v Socialist Workers Party*, 479 US 189, 196; 107 S Ct 533; 93 L Ed 2d 499 (1986). In *Dunn*, *supra* at 346, the United States Supreme Court specifically noted that the record was "totally devoid of any evidence" to support a durational residency requirement. The restriction, in this case a photo identification requirement, must be reasonable *given the interest the restriction allegedly serves*. See *Burdick*, *supra* at 434; *Timmons*, *supra* at 358-359. Deciding if a restriction is constitutional depends very much on "the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification." *Williams*, *supra* at 30; see also *Storer v Brown*, 415 US 724, 731; 94 S Ct 1274; 39 L Ed 2d 714 (1974). Thus, I disagree with the majority that the state is not obligated to provide any evidence to support its asserted interest.

I also disagree with the majority's characterization of the asserted interest. The majority alleges that the interest to be served is preventing voter fraud, but I disagree that the interest in this case can be presented so broadly. "States certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials." *Timmons*, *supra* at

11

364. But that does not mean that by merely making the broad claim of addressing voter fraud, a state has no limits on its actions. See *Dunn*, *supra* at 345-346. It is *the circumstances of the case* that determine the weight that must be afforded a stated interest. *California Democratic Party v Jones*, 530 US 567, 584; 120 S Ct 2402; 147 L Ed 2d 502 (2000). A court must determine the legitimacy and strength of the "precise interest" asserted by the state as its justification for the enacted restriction. *Anderson v Celebrezze*, 460 US 780, 789; 103 S Ct 1564; 75 L Ed 2d 547 (1983). And the restriction must precisely and specifically address the state's interest. *Kusper v Pontikes*, 414 US 51, 59; 94 S Ct 303; 38 L Ed 2d 260 (1973). "If the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties." *Id*.

Of course preventing voter fraud is an important interest in the abstract, but the relevant inquiry is whether, and to what degree, *in-person voter fraud* would be addressed by the photo identification requirement. See *California Democratic Party*, *supra* at 584; see also *American Civil Liberties Union of New Mexico v Santillanes*, 2007 US Dist LEXIS 17087 *98-*99 (D NM, February 12, 2007). Using a broad interest such as preventing voter fraud would allow almost *any* restriction to be deemed constitutional, and this would effectively nullify any true test for constitutionality, thus allowing the government to enact almost any constraint on voting that it chooses, all in the name of preventing "voter fraud." See Commission on Federal Election Reform, *Building Confidence in U.S.*

*Elections* (September 2005) (Comments by Tom Daschle, Spencer Overton, and Raul Yzaguirre) ("The mere fear of voter fraud should never be used to justify denying eligible citizens their fundamental right to vote").[3] But the interest in this case cannot be so simplistically deemed. The interest in this case is more accurately presented as preventing *in-person* voter fraud when there is *no* evidence that *in-person* voter fraud actually exists.

Not only is there no evidence or history of any problem with in-person voter fraud in Michigan, but Kelly Chesney, a spokesperson for Secretary of State Terri Lynn Land, has stated: "'We have a number of checks and balances inherent in the process to prevent "fake people" from voting . . . . We do believe the safeguards in place will protect the integrity of the election.'" Chad Selweski, *Flood of voter registrations raises specter of election fraud*, Macomb Daily, September 30, 2004[4]; see also *Bay Co Democratic Party v Land*, 347 F Supp 2d 404, 437 (ED Mich, 2004). Former Attorney General Frank J. Kelley has also stated that Director of Michigan Elections Christopher Thomas recently informed him "that he had never observed or heard of a single case of a voter using fake identification at the time of voting." Amicus brief at 3. The reality is that the issue of access to the voting polls can unfortunately be turned into a political issue.

---

[3] <http://www.american.edu/ia/cfer/report/report.html> (accessed May 14, 2007).

[4] <http://macombdaily.com/stories/093004/loc_fraud001.shtml> (accessed May 30, 2007).

As reported earlier this year, a federal panel—the Election Assistance Commission—downplayed the findings of experts who conducted election research and found there was little voter fraud around the nation. Ian Urbina, *U.S. Panel is Said to Alter Finding on Voter Fraud*, N.Y. Times, April 11, 2007.[5] Instead, the panel "issued a report that said the pervasiveness of fraud was open to debate." *Id*. The panel also changed the original report's findings that evidence of continued outright intimidation and suppression existed and that registration forms had not been used in polling place fraud. *Id*. Just weeks earlier, the panel had also refused to release another report that it had commissioned that found that voter identification laws reduce turnout, particularly among minority group members. *Id*. Thus, I believe it is clear that the prevalence—or lack thereof—of voter fraud is critical to whether photo identification laws are necessary.

Moreover, when viewed objectively, the claim of "voter fraud" has repeatedly been exposed as a tactic used to suppress the votes of minorities and the poor. See Editorial, *Phony Fraud Charges*, N.Y. Times, March 16, 2007.[6] In partisan political circles, "the pursuit of voter fraud is code for suppressing the votes of minorities and poor people." *Id*. Congress is also investigating

---

[5] Available through purchase at <http://select.nytimes.com/gst/abstract.html?res=FB0713FF395B0C728DDDAD0 894DF404482> (accessed May 30, 2007).

[6] Available through purchase at <http://select.nytimes.com/gst/abstract.html?res=F10C15FE34550C758DDDAA0 894DF404482> (accessed May 30, 2007).

allegations that over a dozen officials in the Justice Department used their positions for partisan purposes by enacting policies and actively supporting legislation that would impose a photo identification requirement for the purpose of suppressing the votes of minority voters. See Greg Gordon, *Congress eyes alleged suppression of minority votes*, Lansing State Journal, May 21, 2007, p 3A. There is mounting evidence that Justice Department officials used their positions to clear "the way for laws designed to disenfranchise minority voters . . . ." Editorial, *Why This Scandal Matters*, N.Y. Times, May 21, 2007.[7]

But as *The New York Times* reported, "There is no evidence of rampant voter fraud in this country." *Id*. Instead, these allegations have been used as an excuse to pass legislation that will suppress the votes of the poor, the elderly, and minorities. *Id*. "The claims of vote fraud used to promote these measures usually fall apart on close inspection." *Id*. For example, allegations that African-American voters in St. Louis listed addresses that were vacant lots have been determined to be unfounded. *Id*. When a local newspaper looked into these allegations, "it found that thousands of people lived in buildings on lots that the city had *erroneously* classified as vacant." *Id*. (emphasis added).

The majority seeks to buttress its position by arguing that the requirement is constitutional because there is evidence that 46 "dead" people voted in the

---

[7] Available through purchase at <http://select.nytimes.com/gst/abstract.html?res=F7081FF635550C728EDDAC08 94DF404482> (accessed May 30, 2007).

15

November 2004 election.  See *ante* at 42 n 110.  This makes a snappy sound bite, but a more thoughtful examination of this allegation results in the finding that administrative problems and clerical errors are likely at the root of these "dead" people voting.  For example, one newspaper article stated that it appeared that approximately 40 people who are dead cast votes in the primary election in August 2006 out of 134,629 votes cast in Detroit.  *Many Names on City's Voter Lists may not Belong*, Detroit Free Press, November 3, 2006, 1B.  But of these 40 people, 25 died within six weeks before the election, so those votes may have been validly cast by absentee ballot before the citizen died.

But, even more importantly, another article indicated that the city of Detroit's election records are "plagued with mistakes and inconsistencies."  *In Mich., Even Dead Vote*, Detroit News, February 26, 2006.[8]  Many voting "errors" were the result of clerical errors—incorrect birthdates and addresses being recorded, as well as election workers recording votes under a similar name or confusing voters with a relative.  *Id*.  The article further stated that there was no evidence of voter fraud, although allegations of fraud had been made particularly related to *absentee ballots*.  *Id*.  And in articles cited by the Attorney General who filed a brief *in support of the requirement*, the problem with voting errors is again identified as being because of administrative problems with the voter rolls.  See,

---

[8] Available through purchase at <http://www.detnews.com/apps/pbcs.dll/article?AID=/20060226/METRO/602260 301&temp1> (accessed July 5, 2007).

16

e.g., Kathleen Gray, John Bebow, and Ben Schmitt, *Detroit's Flawed Registry: Many Erroneous Names Found on City's Voter Rolls*, Detroit Free Press, November 3, 2005; *In Mich., Even Dead Vote*, *supra*.[9] An analysis of voting by *The Detroit News* found, "Clerical errors so pervasive that it is difficult to determine in many instances who actually voted. Incorrect addresses, wrong birthdates and expired residencies; typographical errors in names and addresses; and garbled spellings are regularly recorded and kept on the city's active voter list." *In Mich., Even Dead Vote*, *supra*. "Among the most common mistakes occur when election workers record a vote under a similar name, or confuse voters with their parents or other relatives." *Id*.; see also Spencer Overton, Article: *Voter identification*, 105 Mich L R 631, 645-647 (2007). Current statutory provisions already deal with these administrative issues, including MCL 168.510, which requires that the county clerk forward monthly a list of those who have died to the clerk of each city or township within the county. "The city or township clerk shall compare this list with the registration records and cancel the registration of all deceased electors." *Id*. If the concern truly is about "dead" people voting, the simple solution is an *administrative* one—do what the law requires and properly purge the voting rolls.

---

[9]Available at <http://72.14.203.104/search?q=cache:WoHvRHJJ6i0J:www.freep.com/news/loc way/voters> (accessed July 5, 2007).

17

The photo identification requirement at issue is not narrowly tailored to meet a compelling state interest because there is *no evidence* of in-person voter fraud. Thus, there is no evidence of any documented need to impose a photo identification requirement. But an examination of whether the photo identification requirement violates the Equal Protection Clause does not just stop with identifying the state's interest—in this case, nonexistent in-person voter fraud. The Court must also consider the character and magnitude of the burden, as well as the interests affected by the burden. *Dunn*, *supra* at 335. This Court has declared: "It can be stated without exaggeration that the right to vote is one of the most precious, if not the most precious, of all our constitutional rights." *Wilkins*, *supra* at 680. "The right to vote has been considered to be the most vital of our constitutional rights." *Id*. at 694. Voting is a fundamental right because it is preservative of all other rights. *Yick Wo v Hopkins*, 118 US 356, 370; 6 S Ct 1064; 30 L Ed 220 (1886). And this basic fundamental right cannot be infringed merely because the government seeks to assert its power over supervising elections. *Kusper*, *supra* at, 414 US at 57.

In this case, the requirement deals with actual *access* to the ballot box. In cases dealing with direct ballot access, such as cases that deal with a residency requirement or a property ownership requirement, the most exacting level of scrutiny is required. *Dunn*, *supra* at 335; *Kramer*, *supra* at 626-627. Likewise, the requirement at issue in this case goes to the very heart of a citizen's ability to vote *at all*. As the United States Supreme Court has recognized, not all cases

18

dealing with election regulations are reviewed the same and cases that deal with actual *voting* rights are quite different than those that deal with other regulations. See *California Democratic Party*, *supra* at 573. Because the photo identification requirement will significantly affect the voting rights of thousands of Michigan citizens and have discriminatory effects, "applying heightened scrutiny helps to ensure that such limitations are truly justified and that the State's asserted interests are not merely a pretext for exclusionary or anticompetitive restrictions." *Clingman*, *supra* at 603 (O'Connor, J., concurring).

Contrary to the majority's assertion that the photo identification requirement "applies evenhandedly to every registered voter," *ante* at 22, this legislation does *not* affect all Michigan citizens equally, and it is disingenuous—at best—to claim that it does. As the United States Supreme Court stated in *Anderson*, *supra* at 786 (citation omitted), it is important to examine a restriction "'in a realistic light'" to determine the extent and nature of the restriction's impact on voters. In *Bullock v Carter*, 405 US 134, 144; 92 S Ct 849; 31 L Ed 2d 92 (1972), the United States Supreme Court determined that a filing fee requirement for primary elections was unconstitutional because of "the obvious likelihood that [the] limitation would fall more heavily on the less affluent segment of the community . . . ." The Court stated that "we would ignore reality were we not to recognize that this system falls with unequal weight on voters, as well as candidates, according to their economic status." *Id*. The "practical difficulties" of

19

a restriction on those who will be affected must be considered in any constitutional analysis. See, e.g, *Lane*, *supra* at 277.

Examining the photo identification requirement "in a realistic light" clearly indicates that distinct populations in Michigan will be uniquely and substantially burdened by the photo identification requirement. The reality is that not all our citizens live a life in which they have photo identification and obtaining photo identification solely to vote causes a severe burden. To many, it may seem unimaginable to live a life in which a person has no photo identification, but to thousands of Michigan citizens, it is indeed a reality.

Proponents of the photo identification requirement argue that photo identification is a standard practice in today's world and that photo identification is needed to board an airplane, rent a hotel room, or open an account at a bank. But these arguments ignore that there are segments of our population that do not have the means to board an airplane or rent a hotel room. There are numerous Michigan citizens who do not live a life in which photo identification is a necessity, yet this does not mean that they should be subjected to obstacles when exercising their fundamental right to vote. See, e.g., *Crawford I*, *supra* at 955-956. The failure to recognize that many Michigan citizens live a life in which photo identification is not needed is the reason that proponents fail to recognize that the photo identification requirement will create a substantial obstacle to voting for thousands of Michigan citizens. This classification does not truly apply

"evenhandedly" to every citizen because those without photo identification will more likely be the poor and the disenfranchised.

The photo identification requirement will have a disparate impact on racial and ethnic populations, as well as poor voters, elderly voters, and disabled voters; thus, the photo identification requirement does not affect all citizens equally. Just as the registration scheme in *Lane*, *supra* at 271, inherently operated discriminatorily, the statute at issue will diminish the opportunity for thousands of citizens to participate in the political process. The fact that the photo identification requirement contains no overt statement of discrimination does mean that the requirement will not succeed in disproportionately keeping away members of Michigan's most disenfranchised groups. See, e.g., *Carrington v Rash*, 380 US 89, 92-93; 85 S Ct 775; 13 L Ed 2d 675 (1965). The discrimination that exists in the photo identification requirement is dangerous because of its façade as a "reasonable" requirement to combat voter fraud, but the "Equal Protection Clause likewise guards against subtle restraints on the right to vote, as well as outright denial." *Wilkins*, *supra* at 684. Our citizens' fundamental right to vote cannot be denied or abridged, whether the restriction seeks to directly or indirectly infringe on this right. *Harman v Forssenius*, 380 US 528, 540-542; 85 S Ct 1177; 14 L Ed 2d 50 (1965).

The majority's dismissive attempt to trivialize the effect that this legislation will have on Michigan's citizens is unconvincing because of the majority's choice to ignore the realities associated with the photo identification requirement. The

21

majority belittles any argument that this legislation will negatively affect racial and ethnic populations by claiming that "[w]hen all other arguments are unavailing, resorting to a claim of racial discrimination is a frequent substitute." *Ante* at 45. Notably, the majority ignores that the poor, the elderly, and disabled voters will also be negatively affected by this legislation. Members of Congress, as well as numerous nonprofit organizations, have expressed the same concerns expressed in this dissent. See 148 Cong Rec S10488 (2002). Even the Commission on Federal Election Reform recognizes that concerns about the photo identification requirement, including that the requirement could disenfranchise voters and have an adverse effect on minorities, are "serious and legitimate." *Building Confidence in U.S. Elections*, *supra*. And it is certainly relevant to consider the effect that photo identification requirements have had in states that have enacted identification requirements. See, e.g., *Crawford v Marion Co Election Bd*, 2007 US App LEXIS 7804 at *7 (CA 7, 2007) (Wood, J., dissenting) ("The New York Times recently reported that overall voter turnout in these states decreases by about three percent, and by two to three times that much for minorities.") (citing Christopher Drew, *Low Voter Turnout is Seen in States That Require ID*, NY Times, February 21, 2007).

Yet the majority chooses to ignore this information simply because it could then not flippantly respond that the dissent is raising a hollow claim of racism. But no matter how much the majority engages in figurative eye-rolling, the majority cannot revise history and it cannot change the realities of the society in

22

which we live. Unfortunately, the historical and current reality is that racism exists and voting regulations have been used for discriminatory reasons. The Voting Rights Act of 1965 and the Voting Rights Act Amendments of 1982 were enacted to protect against racial discrimination in voting. See 42 USC 1971 and 42 USC 1973 *et seq*. The United States Supreme Court has recognized that certain groups of people have historically been relegated to a position of political powerlessness. *Plyler*, *supra* at 218; *South Carolina v Katzenbach*, 383 US 301, 308-313; 86 S Ct 803; 15 L Ed 2d 769 (1966). "The experience of our Nation has shown that prejudice may manifest itself in the treatment of some groups." *Id.*; see also *Bone Shirt v Hazeltine*, 336 F Supp 2d 976, 1018-1023, 1026-1027, 1028-1034 (D SD, 2004) ("[T]here is substantial evidence that South Dakota officially excluded Indians from voting and holding office."); *Bone Shirt v Hazeltine*, 200 F Supp 2d 1150, 1152 (D SD, 2002). The majority's steadfast refusal to recognize this fact and consider even the *possibility* that it may affect the real-world implications of the photo identification requirement results in a condescending response to the concerns raised by numerous amici that the constitutional rights of hundreds of thousands of Michigan citizens may be negatively affected by this legislation.

The photo identification requirement may not be as obviously discriminatory as a poll tax, but its effect will be the same.[10] The photo

---

[10] The United States Constitution provides:

(continued…)

identification requirement is merely a more sophisticated device that will disenfranchise our citizens by denying and abridging their fundamental right to vote, and a restriction that places even a minimal price on a citizen's exercising his right to vote constitutes invidious discrimination. See *Bullock*, *supra* at 142; see, e.g., *Building Confidence in U.S. Elections*, *supra* (Comments by Tom Daschle, Spencer Overton, and Raul Yzaguirre) (The photo identification requirement suggested by the Commission on Federal Election Reform is "nothing short of a modern day poll tax."). "[A] state violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard." *Harper*, *supra* at 666. A proper examination of the photo identification requirement demands that this Court look at the true and cumulative effect of the statute's requirement and the state's overall regulations governing photo identification. See, e.g., *Clingman*, *supra* at 599 (O'Connor, J., concurring). This Court must not simply accept the cursory allegation that the photo identification requirement affects everyone equally. It does not. According to the Secretary of State, approximately 370,000 registered Michigan voters do not

---

(…continued)

The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any state by reason of failure to pay any poll tax or other tax. [US Const, Am XXIV, § 1.]

have photo identification.  Dawson Bell, *Court Jumps into Dispute over Voter ID Checks*, Detroit Free Press, April 27, 2006.[11]  While some argue that this number is actually much higher, the fact that hundreds of thousands of Michigan citizens will be affected by this legislation indicates that the requirement is a serious impediment on the fundamental right to vote for these citizens.  See, e.g., *Michigan State UAW*, *supra* at 516-517.[12]

As numerous amici curiae have attested, the impact that this law will have on numerous citizens will be substantial.  Governor Jennifer M. Granholm; Frank J. Kelley, Attorney General Emeritus; the city of Detroit; the National Association

---

[11] Available through purchase at <http://nl.newsbank.com/ml_search/we/Archives?s_site=freep&f_sitename=Detroit+Free+P> (accessed May 30, 2007).

[12] A study by the University of Wisconsin-Milwaukee of the driver's license status of those of voting age in Wisconsin found "[m]any adults do not have either a drivers license or photo ID."  John Pawasarat, *The Driver License Status of the Voting Age Population in Wisconsin*, Employment and Training Institute, University of Wisconsin-Milwaukee, June 2005, at 1, *available at* <http://eti.uwm.edu/Dept/ETI/barriers/DriversLicense.pdf> (accessed May 30, 2007).  Twenty-three percent of people aged 65 or older did not have a driver's license or state photo identification card. *Id*.  "Minorities and poor populations are the most likely to have drivers license problems." *Id*.  In one county, only 47 percent of African-American adults and 43 percent of Hispanic adults had a valid driver's license, compared to 85 percent of Caucasian adults in the rest of the state. *Id*. at 1-2.  When examining young adults aged 18-24 in the same county, only 26 percent of African-American young adults and 34 percent of Hispanic young adults had a valid driver's license, compared to 71 percent of Caucasian young adults in the rest of the state. *Id*. at 2.

Further, a report by the Commission on Federal Election Reform indicates that 12 percent of the voting age population lack a driver's license. *Building Confidence in U.S. Elections*, *supra* (Comments by Tom Daschle, Spencer Overton, and Raul Yzaguirre).

for the Advancement of Colored People (NAACP)-Detroit Branch; the Michigan State Conference NAACP; the National Bar Association; the American Civil Liberties Union of Michigan; the League of Women Voters Detroit; the American-Arab Anti-Discrimination Committee; Project Vote; the Association of Communities for Reform Now; the Latin Americans for Social and Economic Development, Inc.; the Detroit Urban League; the National Conference Community and Justice-Michigan; the Michigan Civil Rights Commission; the Michigan Department of Civil Rights; Michigan Protection & Advocacy Service, Inc.; the Michigan Democratic Party; the Michigan House Democratic Caucus; the Michigan Senate Democratic Caucus; the Michigan Legislative Black Caucus; the Lawyers' Committee for Civil Rights Under Law; and the American Association for Retired Persons (AARP) all provided compelling arguments and information about how the photo identification requirement will truly affect our citizens, and this information should not be ignored. Notably, the amici brief submitted by Michigan county clerks, who are responsible for election administration throughout the state, recognizes, "Voters who do not have these common forms of photo identification [a driver's license, state photo identification card, or possibly a passport] are most likely to be those who do not drive and these, in turn, are most likely to be older, and/or lower income voters, or immigrants." Amici brief at 7. Even the United States Court of Appeals for the Seventh Circuit has

26

recognized that "[n]o doubt most people who don't have photo ID are low on the economic ladder . . . ." *Crawford I*, *supra* at 951.[13]

The photo identification requirement will present a monetary and logistical burden for thousands of our citizens. There is a cost associated with obtaining a driver's license or state identification card. While the state identification card fee can be waived for some people, there are many people who will be required to pay the fee. But this is not the only cost associated with the photo identification requirement. See, e.g., *Weinschenk v State*, 203 SW3d 201, 213-214 (Mo, 2006) (After examining the costs associated with obtaining photo identification required for voting, the Missouri Supreme Court stated that "all fees that impose financial burdens on eligible citizens' right to vote, not merely poll taxes, are impermissible under federal law."). Procuring the documents required to obtain a driver's license or other acceptable state-issued identification also costs money. Multiple documents must be obtained, at a monetary cost, as well as a logistical cost, to then acquire acceptable photo identification. For example, to use a birth certificate as one of the three documents necessary to obtain a state identification card, only a certified birth certificate with a raised seal or a true copy of the birth certificate are

---

[13] The concerns of the amici are further supported by various studies that indicate that a photo identification requirement has a statistically significant effect on voting. Timothy Vercelotti and David Anderson, *Protecting the franchise, or restricting it? The effects of voter identification requirements on turnout*, Rutgers University, 2006, at 1, available at <http://www.eagleton.rutgers.edu/News-Research/VoterID_Turnout.pdf> (accessed July 3, 2007).

27

acceptable; hospital birth certificates are not acceptable.[14]  This, of course, costs even more money than just that required outright for a driver's license or state identification card.  But an interesting and important fact to note is that *photo identification is required to request a copy of one's birth certificate*.  So a person who needs a birth certificate to obtain photo identification must present photo identification to receive the birth certificate.  Further, any documents issued by another country that are not written in English must be translated before they can be used.  Translations are only acceptable from a limited number of organizations, such as a college, government agency, or translation-related business, and the translation must provide detailed information about the translator.  Not only must a person spend money to get the necessary documents to then travel to a Secretary of State office to get the necessary photo identification, but a person must navigate the government system and spend *time* doing so.[15]

---

[14] Older African-American citizens may experience particular difficulties as many were never issued birth certificates because they were born at home. Leighton Ku, Donna C. Ross, and Matt Broaddus, *Survey Indicates Deficit Reduction Act Jeopardizes Medicaid Coverage for 3 to 5 Million Citizens*, Center on Budget and Policy Priorities, revised February 17, 2006, available at <http://www.cbpp.org/1-26-06health.htm> (last accessed June 26, 2007).  One study found that 1/5 of African-Americans adults born in 1939 and 1940 lacked birth certificates. *Id.*

[15] Traveling  the required distance to a Secretary of State office  may indeed  be too burdensome for  many citizens,  including  those  in rural  areas.  For    example, Chippewa   County   has only one   Secretary of State   office.  Secretary       of      State      office      locations,      available      at <http://services.sos.state.mi.us/servicelocator/branchofficelocator.aspx> (accessed July 2, 2007).  Yet Chippewa County occupies 1,561.06 square miles, which

(continued…)

The Michigan county clerks—again the very government officials who administer elections—recognize, "It is clear from examining these requirements for obtaining a personal identification card that it will be a very time consuming matter." Amici brief at 8-9. As the Michigan county clerks further note, "It must be recognized that the very fact that these voters do not drive may make it more difficult for them to travel to the locations where the identification cards are obtained." *Id*. at 7. And to obtain a driver's license or state photo identification card a person *must* travel to an office of the Secretary of State. See, e.g., MCL 28.291. For many citizens, taking the time to do so, which may also mean taking time off work without pay, will create a substantial burden to exercising the citizens' right to vote.

What appears lost on the proponents of the photo identification requirement is that encouraging citizens to vote is an essential state objective, and our government should be trying to promote voting, not passing legislation that will actually discourage participation by throwing up unnecessary roadblocks. "[T]he constitutional order must be preserved by a strong, participatory democratic process." *California Democratic Party*, *supra* at 587 (Kennedy, J., concurring); see also *Building Confidence in U.S. Elections*, *supra* (Comments by Tom Daschle, Spencer Overton, and Raul Yzaguirre) ("Election reform must be about

(…continued)
means that a person may have to travel a significant distance merely to get the identification needed to vote. United States Census Bureau, available at <http://quickfacts.census.gov/qfd/states/26/26033.html> (accessed July 2, 2007).

empowerment, not disenfranchisement. Raising needless impediments to voting or creating artificial requirements to have one's vote counted are steps backward."). But the photo identification requirement is yet another obstacle that a citizen must overcome as he proceeds along the path to exercise his fundamental right to vote. Now that citizen is less likely to exercise his fundamental right to vote because of the photo identification requirement. And the affidavit exception—if a citizen even knows of its existence—is not helpful because of the harassment and intimidation that a voter may face through the challenge process.

Merely being allowed into a polling place does not mean that a citizen's right to vote has been protected. See, e.g., *United States v Saylor*, 322 US 385, 387-388; 64 S Ct 1101; 88 L Ed 1341 (1944). A citizen's right to vote must also be protected throughout the challenge process. The burden of the photo identification requirement must be realistically viewed in light of what this means to the citizen who does not have photo identification but still wants to vote. The burden for a citizen without photo identification is not "simply" a matter of signing an affidavit and then voting. Contrary to the majority's belief, the Michigan county clerks, who will actually administer the election, admit, "It is not yet clear whether an affidavit is a sufficient means for a voter without photo identification to attest that he is who he purports to be but lacks the requisite identification." Amici brief at 10. While the majority presents the affidavit process as an insignificant inconvenience, it is actually much more burdensome to the actual voters.

The lack of photo identification makes it much more likely that a voter will be challenged because the statute explicitly references the challenge process in relation to those signing the affidavit. MCL 168.523. During the challenge process, there is the distinct possibility that a citizen may be denied the right to vote if an election inspector believes that the citizen's answers indicate that he is not a qualified elector or if the citizen chooses not to sign the affidavit. For some citizens with disabilities, the affidavit may be too difficult to sign or understand. However, unfortunately, another likely scenario is that the challenge process will be used in some situations to harass and intimidate citizens who seek to exercise their right to vote. The statute explicitly invites a challenge to a citizen who is voting without photo identification by stating that a citizen "being allowed to vote without the identification required under this subsection is subject to challenge . . . ." *Id.* The challenge process subjects those who are voting without photo identification to delay, intimidation, and harassment to a greater degree than those who have photo identification.[16] Notably, a citizen being challenged must "stand to one side until after unchallenged voters have had an opportunity to vote, when his case shall [then] be taken up and disposed of." MCL 168.728. Waiting

---

[16] The majority argues that the use of the challenge process to harass voters will be deterred because it is a misdemeanor to do so. See *ante* at 44. But it is a *felony* to impersonate another person to vote, yet the majority apparently does not give credence to the fact that this criminal penalty already serves to deter in-person voter fraud. Notably, I again point out that there is *no* evidence of in-person voter fraud, while there *is* evidence of voters having been harassed at the polls. See amici brief of the National Association for the Advancement of Colored People et al, at 16-17, 24-25; exhibits 3-6.

for long periods at the polls is not uncommon, and now voters who are challenged because they do not have photo identification must wait indefinitely longer to resolve the challenge. This practical, real-world effect can be used to substantially penalize and harass those without photo identification.[17]

But a penalty cannot be imposed on a citizen who chooses to exercise his right to vote merely because he does not have photo identification. See *Dunn*, *supra* at 341, citing *Harman*, *supra* at 540. "To the extent that a citizen's right to vote is debased, he is that much less a citizen." *Reynolds*, *supra* at 567. As this Court has recognized, the fundamental right to vote cannot be left to the whim or impulse of an election official. *Wilkins*, *supra* at 677. It certainly is beyond dispute that certain voters in our country—and even our state—have been intimidated and harassed to keep those citizens from voting. See, e.g., Note: *Eradicating racial discrimination in voter registration: Rights and remedies under the voting rights act amendments of 1982*, 52 Fordham L R 93 (1983). The Commission on Federal Election Reform reports that during the 2004 elections, there were "improper requests for voter ID" and there were reports "of voter intimidation and suppression tactics." See *Building Confidence in U.S. Elections*, *supra*. Of 55,000 calls made to a MYVOTE1 hotline on election day in 2004, 4.9

---

[17] See, e.g., Berry, Comment: *Take the money and run: Lame-ducks "quack" and pass voter identification*, 74 U Det Mercy L R 291, 297 (1997) (citing Jeff Gerritt, *Long Waits Prove Vote System Dated*, Detroit Free Press, November 7, 1996) (The wait was so long at some polls that some voters walked in, turned around, and walked out.).

percent of the calls were about coercion and intimidation and 43.9 percent of the calls were about registration issues and poll access. Notably, election challengers in Michigan can be appointed by political parties, which may provide an added incentive for challenges to be made. If a challenge is successful and a citizen is deemed unqualified, there is no appeal from this decision, so a citizen's denial of his fundamental right is absolute. See MCL 168.729. The photo identification requirement and the challenge process now again leave those who do not have photo identification at the whim of election officials as our challenged citizens are required to wait an indefinite length of time merely to exercise their fundamental right to vote.

Notably, there are already numerous statutes that criminalize voter fraud. To name just a few, it is a felony to falsely impersonate another person to vote or attempt to vote, and it is also a felony to try to induce a person to impersonate another person to vote or attempt to vote. MCL 168.932a(a). It is a felony to assume a false or fictitious name to vote. MCL 168.932a(b). It is a misdemeanor for an elector to make a material statement that is false in answering a question asked by a clerk or assistant clerk or in a registration affidavit. MCL 168.499(1). And it is perjury to give an untrue answer concerning a material matter when challenged. MCL 168.729.

Given these statutes that criminalize voter fraud, as well as the state's comprehensive statutory scheme that manages all aspects of voting, the state's actions in mandating photo identification are certainly not narrowly tailored or

even reasonable. See *Dunn*, *supra* at 345-346; *Bay Co Democratic Party*, *supra* at 437. Any concerns about preventing voter fraud must examine the current system to determine its completeness. *Wilkins*, *supra* at 687. In *Dunn*, a durational residency requirement, even assuming it had once been necessary, was no longer required because of the state's comprehensive statutory scheme. Similarly, Michigan's statutory scheme is comprehensive when dealing with voter regulations. For example, when a citizen appears at the polls to vote, the citizen must complete an application that includes his signature and address. MCL 168.523(1). If voter registration lists are used, then the citizen must provide his date of birth or other information that appears on the voter registration list. *Id*. Also, if the qualified voter file is available at the polling place, the election official must compare the signature on the voter's application that was completed at the polling place with the signature in the qualified voter file. *Id*.

There are also numerous laws that address the qualifications of voters, MCL 168.492; the contents of registration affidavits, MCL 168.495; ascertaining whether a voter is already registered, MCL 168.505; changes of a voter's residence, MCL 168.506, MCL 168.507, MCL 168.507a, and MCL 168.507b; verifying the correctness of registration records by conducting a house-to-house canvas, MCL 168.515; and even registering voters confined in jail, MCL 168.492a, to name just a few. Thus, there are "a variety of criminal laws that are more than adequate to detect and deter whatever fraud may be feared." *Dunn*, *supra* at 353. When there is such a comprehensive statutory design to prevent,

34

address, and punish in-person voter fraud, imposing a photo identification requirement that will restrict our citizens' fundamental right to vote is unnecessary and certainly not the least restrictive means to prevent voter fraud. See *id*. at 353-354.

Further, the photo identification requirement will do nothing to actually prevent in-person voter fraud, even if an incident were to occur in the future. The majority makes much of the exception to the photo identification requirement that allows a citizen to sign an affidavit attesting that he is who he says he is. This affidavit allows a person to vote without showing photo identification. But if a person is willing to break the law and commit in-person voter fraud, then signing this affidavit will do nothing to deter the fraud from occurring. A person willing to risk committing a felony and being sent to prison to commit in-person voter fraud is not going to be affected by having to sign a piece of paper. "[F]alse swearing is no obstacle to one intent on fraud . . . ." *Dunn*, *supra* at 346. As the United States Supreme Court recognized when striking down a durational residency requirement: "The nonresident intent on committing election fraud will as quickly and effectively swear that he has been a resident for the requisite period of time as he would swear that he was simply a resident." *Id*. The oath swearing "becomes an effective voting obstacle only to residents who tell the truth and have no fraudulent purposes." *Id*. at 346-347. Likewise, the only citizens in Michigan who will be affected will be legitimate voters who stay away from the polls because they do not know there is an exception to the photo identification

35

requirement or those voters who fear they will suffer harassment and intimidation through the affidavit challenge process.

## III. THE PHOTO IDENTIFICATION REQUIREMENT IS NOT EVEN JUSTIFIED BY A REASONABLE RATIONALE

Even if the photo identification requirement is examined under a lesser standard, the photo identification requirement is an unconstitutional burden nonetheless, because it is not a reasonable and nondiscriminatory restriction justified by an important state interest. See *Burdick*, *supra* at 434. The government's interest in mandating the photo identification requirement must be sufficiently weighty to justify the restriction. See *Timmons*, *supra* at 365. But here the government's interest has *no* weight because there is absolutely *no* evidence that a problem with in-person voter fraud even exists.

I join my colleagues in their desire to prevent voter fraud, but I am unwilling to do so at any cost. No matter how many times the majority argues that the photo identification requirement is necessary to prevent vote dilution, it does not change the fact that there is *no evidence* of in-person voter fraud. Merely making the claim does not make it so. When there is *no* evidence of in-person voter fraud that will be corrected by the photo identification requirement and no credible evidence of this problem existing *nationwide*, I cannot join the majority in finding that this requirement is constitutional. See 148 Cong Rec S10488 (2002); see also *Common Cause/League of Women Voters of Georgia, Inc v Billups*, 439 F Supp 2d 1294, 1350 (ND Ga, 2006). "There is nothing in the Constitution which

permits the Legislature, under the desire to purify elections, to impose any conditions which will destroy or seriously impede the enjoyment of the elective franchise." *Attorney General v Bd of Councilmen of the City of Detroit*, 58 Mich 213, 216; 24 NW 887 (1885). "For even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty. Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *Anderson*, *supra* at 806 (internal quotation marks and citations omitted).

It is *not reasonable* to impose a photo identification requirement when the alleged interest is *nonexistent* in-person voter fraud, especially when the requirement will significantly impinge on the rights of thousands of Michigan's citizens. The majority cannot dismiss the argument that there is no evidence of in-person voter fraud by stating that it just does not matter. It certainly matters when our citizens will have their fundamental voting rights restricted. To ascertain whether the restriction is warranted, it is indeed essential to factor into the analysis the fact that no in-person voter fraud has been shown to exist. A bald assertion is insufficient—a state's asserted interest in a restriction must bear some sort of plausible relationship to the burden the restriction will place on its citizens. See *Timmons*, *supra* at 374-375 (Stevens, J., dissenting). And "[i]f the State has open to it a less drastic way of satisfying its legitimate interest, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties." *Anderson*, *supra* at 806 (internal quotation marks and citation omitted).

The photo identification requirement that is being touted as a solution to a nonexistent problem is indeed unconstitutional because it addresses an imaginary problem while significantly undermining and burdening our citizens' constitutional rights.

## IV. CONCLUSION

The constitution demands that the government vigorously protect our citizens' fundamental right to vote. Our citizens must be able to exercise their right to vote without encumbrances that are unconstitutional and have the practical effect of limiting this right. Today's decision is alarming because it ignores the reality of the photo identification requirement and validates the Legislature's shortsighted attempt to restrict the rights of our citizens. It trivializes the effect that this ill-advised legislation will have on our poorest and, in many cases, most disenfranchised citizens. It appears to stem from a belief that the government gives rights to its citizens and can take these rights away on a whim and with the flimsiest of excuses. But a significant impairment of our citizens' fundamental right to vote requires justification. While this Court has abdicated its responsibility to require this justification, I believe that our citizens must demand more. Thus, I respectfully dissent.

Michael F. Cavanagh

S T A T E  O F  M I C H I G A N

SUPREME COURT

*In re* REQUEST FOR ADVISORY
OPINION REGARDING                                                    No. 130589
CONSTITUTIONALITY OF 2005 PA 71
_____

KELLY, J. (*dissenting*).

This case involves the constitutionality of mandating that registered voters show photographic identification before being allowed access to the voting booth. Under 2005 PA 71, if a voter is unable to show the required identification, he or she must sign an affidavit swearing to that fact in order to vote.

This new law impinges on the fundamental right to vote. Before today, this Court consistently applied a strict scrutiny analysis to any law or regulation that impinged on that right. But, in upholding the constitutionality of 2005 PA 71, the majority announces that strict scrutiny is now the wrong test. Relying on the United States Supreme Court's decision in *Burdick v Takushi,*[1] it concludes that a number of this Court's past voters' rights decisions no longer are good law. Because I disagree, I respectfully dissent.

First, *Burdick* did not signal a change in the law. It was simply a clear articulation of the rule that emerges from synthesizing earlier United States Supreme Court decisions in this area. *Burdick* also did not overrule past decisions

_____
[1] 504 US 428; 112 S Ct 2059; 119 L Ed 2d 245 (1992).

of either the United States Supreme Court or of this Court. A proper application of the law declared in these decisions convinces me that 2005 PA 71 is unconstitutional. It is a serious error for the Michigan Supreme Court to ignore this long-revered caselaw.

Second, the majority of this Court has uncritically adopted what it believes is a rule mandated by the federal constitution. In so doing, it essentially confers on the United States Supreme Court the functional ability to amend our state constitution. The majority's decision to adopt in lockstep what it mistakenly believes is the federal standard renders our state constitutional provisions nugatory. And it represents a failure of this Court to fulfill its constitutional duty.

In reliance on the Michigan Constitution and the caselaw interpreting it, I would hold that infringements on the right to vote that cannot withstand the most exacting scrutiny are unconstitutional. Because 2005 PA 71 infringes on the right to vote and is not narrowly tailored to achieve a compelling governmental interest, it is unconstitutional under both the federal and the state constitutions.

## I. THE FACTS

The legal question that we are considering here has its genesis in MCL 168.523, § 523 of the Michigan Election Law,[2] which was enacted by the Legislature in 1996 PA 583. Section 523(1) requires that each voter identify himself or herself by

---

[2] MCL 168.1 *et seq.*

presenting an official state identification card issued to that individual pursuant to Act No. 222 of the Public Acts of 1972, being sections 28.291 to 28.295 of the Michigan Compiled Laws, an operator's or chauffeur's license issued to that individual pursuant to the Michigan Vehicle Code, Act No. 300 of the Public Acts of 1949, being sections 257.1 to 257.923 of the Michigan Compiled Laws, or other generally recognized picture identification card . . . .

Section 523(1) also provides:

If the elector does not have an official state identification card, operator's or chauffeur's license as required in this subsection, or other generally recognized picture identification card, the individual shall sign an affidavit to that effect before an election inspector and be allowed to vote as otherwise provided in this act. However, an elector being allowed to vote without the identification required under this subsection is subject to challenge as provided in section 727.

Pursuant to these requirements, before being given a ballot, each registered voter would have to identify himself or herself by presenting (1) an official state identification card, (2) an operator's or chauffeur's license, or (3) another generally recognized picture identification card. If the voter did not have the required photo identification, the voter would have to sign an affidavit swearing to his or her identity. If the voter complied, he or she would be allowed to vote, but would be subject to challenge under MCL 168.727, in which case, the right to vote might be denied. It is not clear what would happen if a registered voter had photo identification but was not in possession of it at the polling place.

Before the requirements of § 523 became effective, then-Attorney General Frank J. Kelley evaluated it pursuant to MCL 14.32 and found that the photo identification requirements violated the Equal Protection Clause of the United

3

States Constitution, US Const, Am XIV.  OAG, 1997-1998, No 6930, p 1 (January 29, 1997).  As a result, § 523 was never implemented or enforced.

Nine years later, the Legislature enacted 2005 PA 71.  The new act essentially repeated the same requirements that were in the version of § 523 enacted in 1996 PA 583.  In February of the next year, the Michigan House of Representatives, by resolution, asked this Court to issue an opinion on the constitutionality of 2005 PA 71.  See 2006 House Journal 17 (Resolution No. 199, February 21, 2006).  We granted the request.  474 Mich 1230 (2006).

As a consequence, the question before us is the constitutionality of 2005 PA 71.  It is beyond argument that the photographic identification requirements of the act infringe on the paramount and fundamental right to vote.  Nonetheless, a majority of this Court has decided that these requirements will pass constitutional muster if they can withstand only a minimal level of scrutiny.  I do not agree.  For the reasons that follow, I would hold that the requirements of the act violate both the federal and state constitutions.

## II.  THE UNITED STATES CONSTITUTION

The United States Supreme Court has stated on many occasions that the right to vote is fundamental.  E.g., *Anderson v Celebrezze*, 460 US 780; 103 S Ct 1564; 75 L Ed 2d 547 (1983); *Reynolds v Sims*, 377 US 533; 84 S Ct 1362; 12 L Ed 2d 506 (1964); *Yick Wo v Hopkins,* 118 US 356; 6 S Ct 1064; 30 L Ed 220 (1886).  "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must

4

live.   Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v Sanders*, 376 US 1, 17; 84 S Ct 526; 11 L Ed 2d 481 (1964).  Because this right is so precious, federal courts have consistently applied the most demanding level of scrutiny to governmental action that interferes with access to the voting booth.  See, e.g., *Dunn v Blumstein*, 405 US 330; 92 S Ct 995; 31 L Ed 2d 274 (1972); *Kramer v Union Free School Dist No 15*, 395 US 621; 89 S Ct 1886; 23 L Ed 2d 583 (1969).

The majority acknowledges that the right to vote is of fundamental importance.  But it has decided that, because of the United States Supreme Court's decision in *Burdick,* a more relaxed standard now applies to governmental measures that limit the right to cast a ballot.  The majority is badly mistaken.

A. *BURDICK V TAKUSHI*

At issue in *Burdick* was Hawaii's prohibition on write-in voting.  *Burdick*, 504 US at 430.  Under Hawaii election law, write-in votes were simply ignored. *Id.* at 436.  The plaintiff filed suit, claiming that the prohibition violated his rights under the First and Fourteenth amendments.  *Id*. at 430.

The Court stated the standard to be applied in analyzing whether a voting regulation unconstitutionally infringes on these rights:

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it

5

necessary to burden the plaintiff's rights."   [*Id.* at 434 (citations omitted).]

The Court explained that the rigorousness of the Court's scrutiny depends on the degree to which voting restrictions burden the right to vote.  If that right is severely restricted, the restrictions, to be constitutional, must be drawn narrowly so as to advance a state interest of compelling importance.  *Id.*  But, when the restrictions impose only "'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions."  *Id.* (citations omitted).   The Court found that Hawaii's prohibition did not violate the plaintiff's constitutional rights because it created a minor burden while promoting the state's legitimate interest.  *Id.* at 430.

A majority of this Court has concluded that the decision in *Burdick* worked a dramatic shift in the law.  In fact, it asserts that *Burdick* repudiated a previous construction of the federal Equal Protection Clause that was erroneous.

The majority has misread *Burdick.*  The case broke no new ground.  Rather than create a new rule or signal a shift in the law, *Burdick* simply announced a rule that synthesized past decisions of the United States Supreme Court and articulated, in one test, already established legal principles.[3]

---

[3] *Burdick* was not the first case to articulate the standard that emerges from blending United States Supreme Court decisions in the area of voting rights.  The balancing test set forth in *Burdick* seems to have originated in *Storer v Brown,* 415 US 724; 94 S Ct 1274; 39 L Ed 2d (1974), and *American Party of Texas v White*,

(continued…)

Contrary to the majority's claim, the federal constitution has never required that every law regulating elections must withstand strict scrutiny. E.g., *Jenness v Fortson*, 403 US 431, 440-442; 91 S Ct 1970; 29 L Ed 2d 554 (1971);[4] *Storer*, 415 US at 730;[5] *Anderson*, 460 US at 788.[6] Rather, the federal constitution has

---

(…continued)
415 US 767; 94 S Ct 1296; 39 L Ed 2d 744 (1974). In these two cases, the Court applied a type of intermediate scrutiny to the regulations under consideration. Zywicki, *Federal judicial review of state ballot access regulations: Escape from the political thicket*, 20 T Marshall L R 87, 113-114 (1994). It appears that it is this intermediate level of scrutiny that led to the balancing test that the United States Supreme Court first clearly expressed in *Anderson,* 460 US at 789, and the majority attributes to *Burdick*. See Zywicki, *supra,* pp 114-116. See also Note: *Better late than never: The John Anderson cases and the constitutionality of filing deadlines*, 11 Hofstra L R 691, 703-704 (1983).

[4] In *Jenness*, in a perfunctory fashion that is inconsistent with strict scrutiny review, the Court upheld a petition nominating requirement because it was not unduly burdensome. *Id.* at 440-442.

[5] In *Storer*, the Court stated that "the rule fashioned by the Court to pass on constitutional challenges to specific provisions of election laws provides no litmus-paper test for separating those restrictions that are valid from those that are invidious under the Equal Protection Clause. The rule is not self-executing and is no substitute for the hard judgments that must be made. Decision in this context, as in others, is very much a 'matter of degree . . . .'" 415 US at 730.

[6] In *Anderson*, the Court set forth the test that the majority attributes to *Burdick*.

> Constitutional challenges to specific provisions of a State's election laws therefore cannot be resolved by any "litmuspaper test" that will separate valid from invalid restrictions. Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In

(continued…)

7

consistently been interpreted to require application of a strict scrutiny analysis only if the right to vote has been subjected to a severe restriction. Cases both predating and postdating *Burdick* illustrate that statutes that impair an individual's right to *cast a ballot*, as 2005 PA 71 does, are severe restrictions.[7]

## B. *HARPER V VIRGINIA BD OF ELECTIONS*[8]

In *Harper*, the Supreme Court found that Virginia's poll tax requirement for state elections violated the Equal Protection Clause. 383 US at 666. It made clear that it greatly disfavors requirements not related to one's ability to participate intelligently in the electoral process and that threaten to deprive one of the right to vote. *Id.* at 668. When such requirements are at issue, the Court declared, the degree to which the right to vote is impaired is irrelevant. *Id.* If the regulation is

---

(…continued)

> passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional. [460 US at 789 (citation omitted).]

[7] A closer look at the *Burdick* opinion reveals the error of the majority's analysis. The right at issue in the instant case is the right to cast a ballot. It is a fundamental right. *Dunn*, 405 US at 336. *Burdick* did not involve an individual's right to cast a ballot. It involved a candidate's right to appear on the ballot. The right of candidacy has never been recognized as a fundamental right. *Clements v Fashing*, 457 US 957, 963; 102 S Ct 2836; 73 L Ed 2d 508 (1982). Thus, *Burdick* is virtually of no assistance in determining whether the requirements at issue work a severe burden on the fundamental right to vote.

[8] 383 US 663; 86 S Ct 1079; 16 L Ed 2d 169 (1966).

not narrowly tailored to achieve a compelling governmental interest, even a small impairment will violate the Equal Protection Clause. *Id.*

## C. *KRAMER V UNION FREE SCHOOL DIST NO 15*

Similarly, in *Kramer*, a bachelor living with his parents challenged a New York law. It limited the individuals eligible to vote in school district elections to owners of property within the district and parents of children enrolled in the local public school. *Kramer*, 395 US at 622. The Court considered whether the limitations violated the Fourteenth Amendment. *Id.* at 626. The Court concluded that "if a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest." *Id.* at 627.

## D. *DUNN V BLUMSTEIN*

And in *Dunn,* the United States Supreme Court struck down a durational residency requirement. 405 US at 333. It found that any one citizen in the jurisdiction has a constitutionally protected right to participate in elections on an equal basis with any other citizen in the jurisdiction. *Id.* at 336. And before that right may be restricted, the purpose of the restriction and the overriding interests served by it must meet close constitutional scrutiny. *Id.* The Court found that strict scrutiny "is required for any statute that 'place[s] a condition on the exercise of the right to vote.'" *Id.* at 337, quoting *Bullock v Carter*, 405 US 134, 143; 92 S Ct 849; 31 L Ed 2d 92 (1972).

9

The majority ignores each of these pre-*Burdick* cases because it believes that *Burdick* signaled a shift in the law. But *Burdick* did no more than clearly articulate the law as it existed at the time it was written. It did nothing to overrule prior decisions.[9] And, the United States Supreme Court's post-*Burdick* decision in *Bush v Gore*[10] confirms that a restriction works a severe burden and is subject to strict scrutiny if it interferes with an individual's right to cast an equal ballot.

### E. *BUSH V GORE*

In *Bush*, the Court considered whether Florida's manual recount of ballots violated the Fourteenth Amendment. The standard for what qualified as a legal vote differed from county to county. *Bush*, 531 US at 103. In deciding the case, the Court noted that one source of the fundamental nature of the right to vote "lies in the equal weight accorded to each vote and the equal dignity owed to each voter." *Id.* at 104. Because "[t]he right to vote is protected in more than the initial allocation of the franchise[, e]qual protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* Ultimately, the Court held that the recount of votes was

---

[9] Yet, the members of the majority find that *Burdick* repudiated an erroneous construction of the Equal Protection Clause. I am baffled by how they arrive at this conclusion. It seems to me highly unlikely that our most revered legal institution would announce a dramatic shift in the law without at least suggesting it and limiting existing precedent.

[10] 531 US 98; 121 S Ct 525; 148 L Ed 2d 388 (2000).

unconstitutional because the lack of a clear standard permitted an unequal evaluation of the ballots. *Id.* at 110.

Though factually distinguishable from the instant case, *Bush* is relevant because it is the only post-*Burdick* United States Supreme Court decision involving an individual's right to cast an equal ballot.[11] The *Bush* Court peremptorily dismissed the state interests that were asserted and struck down the recount. In so doing, it had to have used a strict scrutiny standard.[12] Hence, the *Bush* decision stands as reassurance that the pre-*Burdick* decisions that applied a strict scrutiny analysis to infringements of a voter's right to cast a ballot are still good law.[13]

---

[11] *Bush* does not even mention *Burdick*. The fact that *Bush* does not discuss *Burdick* is further substantiation that *Burdick* is not the landmark decision that the majority would have us believe.

[12] In *Bush*, the Supreme Court never explicitly stated what level of scrutiny it used in reviewing the constitutionality of the recount. However, the fact that the Court found the recount unconstitutional after summarily dismissing the interests prompting the recount indicates that the Court was utilizing strict scrutiny review. See *Stewart v Blackwell*, 444 F3d 843, 862 (CA 6, 2006); Hasen, *Symposium: The law of presidential elections: Issues in the wake of Florida, 2000: Bush v Gore and the future of equal protection law in elections*, 29 Fla St U L R 377, 395-396 (2001).

[13] For additional post-*Burdick* federal decisions finding that strict scrutiny applies to regulations that directly burden the right to cast a ballot, see, e.g., *Greidinger v Davis*, 988 F2d 1344, 1354 (CA 4, 1993) (finding that strict scrutiny applies to a voter registration scheme that conditions a voter's right to vote on the public disclosure of the voter's social security number); *Republican Party of Arkansas v Faulkner Co*, 49 F3d 1289, 1298-1299 (CA 8, 1995) (Finding that the requirement that political parties conduct and pay for primary elections was subject to strict scrutiny. This is because it had the effect of forcing many voters,

(continued…)

11

F.  THE PHOTO IDENTIFICATION REQUIREMENTS

At this time, the Secretary of State estimates that 370,000 Michigan registered voters do not have photo identification.[14]   The photographic identification requirements of 2005 PA 71 mandate that these individuals obtain photographic identification or sign an affidavit before they can vote.  The teaching of the United States Supreme Court's decisions in *Harper*, *Kramer, Dunn, Bush,* and their progeny[15] is that these requirements work a severe burden on the right to vote.[16]

---

(…continued)
who wished to vote in the Republican primary, to vote either in the Democratic primary or not at all.).

[14] D. Bell, *Court Jumps Into Dispute Over Voter ID Checks,* Detroit Free Press (April 27, 2006) (quoting Secretary of State spokeswoman Kelly Chesney).

[15] E.g., *Kusper v Pontikes*, 414 US 51; 94 S Ct 303; 38 L Ed 2d 260 (1973) (Striking down a party affiliation statute that impaired the right to vote by preventing individuals who had voted in a primary from voting in another party's primary for nearly two years.  Less drastic alternatives existed that satisfied the state's interest involved.); *Hill v Stone*, 421 US 289, 298; 95 S Ct 1637; 44 L Ed 2d 172 (1975) (Striking down a "dual box" voting technique because "in an election of general interest, restrictions on the franchise of any character must meet a stringent test of justification.").

[16] None of the cases cited by the majority for the proposition that a lower standard of review applies concerned the regulation of an individual's right to *cast* a ballot.  The United States Supreme Court decisions cited by the majority are (1) *Burdick,* 504 US 428, (2) *Timmons v Twin Cities Area New Party*, 520 US 351; 117 S Ct 1364; 137 L Ed 2d 589 (1997), and (3) *Storer,* 415 US 724.  Each of these cases dealt with a candidate's right to get on the ballot, not an individual's right to *cast* a ballot.  The right of candidacy has never been recognized as a fundamental right.  *Clements*, 457 US at 963.  But, as the cases I cite demonstrate, (continued…)

12

Because "equal dignity [is] owed to each voter,"[17] the most "exacting test is required for any statute that 'place[s] a condition on the *exercise* of the right to vote.'" *Dunn*, 405 US at 337 (quoting *Bullock*, 405 US at 143) (emphasis added). Where access to the ballot box is impeded because of qualifications or requirements, such as (1) the poll tax in *Harper,* (2) the property ownership requirement in *Kramer*, (3) the durational residency requirement in *Dunn*, or (4) the photo identification and affidavit requirements in this case, the most exacting level of scrutiny must be applied.

G.  THE AFFIDAVIT OPTION OF 2005 PA 71

The majority concludes that it is because 2005 PA 71 includes the affidavit option that a minimal level of review of the photo identification requirement is appropriate.  However, the affidavit option itself interferes with the right of individuals lacking photo identification to cast a ballot.  The assistant attorney general who argued in support of the constitutionality of the act concedes this point.  Even if, as the majority asserts, signing an affidavit were a minor obstacle, it is an obstacle that is imposed on only a select group of otherwise qualified voters.

---

(…continued)
when an individual's right to *cast* a ballot is impaired, the United States Supreme Court has uniformly held that strict scrutiny applies.

[17] *Bush*, 531 US at 104.

13

"[W]here a law classifies in such a way as to infringe constitutionally protected fundamental rights, heightened scrutiny under the Equal Protection Clause is required." *New York Attorney General v Soto-Lopez*, 476 US 898, 906 n 6; 106 S Ct 2317; 90 L Ed 2d 899 (1986). And a restriction that burdens the right of only a select group of citizens to access the ballot is sufficient to trigger strict scrutiny review under the federal constitution. See, e.g., *Harper*, 383 US at 670;[18] *Wesberry*, 376 US at 17-18;[19] Nowak & Keeton, Constitutional Law (5th ed), § 14.31, p 866.[20] As the *Burdick* Court itself stated, a lower standard of review will apply only to "'nondiscriminatory restrictions.'" *Burdick*, 504 US at 434 (citation omitted). Because only individuals without photo identification will be subject to the affidavit process, these requirements clearly discriminate between individuals with photo identification and individuals without such identification.[21] Therefore,

---

[18] "[W]here fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined."

[19] "Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right."

[20] "Because the right to vote is a fundamental right, any classification defining the ability to exercise the right must meet, under a strict scrutiny review, the dictates of the equal protection guarantee before the Court can sustain the measure as constitutional."

[21] "Discriminate" is defined as "to make a distinction in favor of or against a person on the basis of the group or class to which the person belongs, rather than according to merit." *Random House Webster's College Dictionary* (2001).

contrary to the position of the majority, the affidavit option does nothing to reduce the level of scrutiny that applies to 2005 PA 71.

## H. THE RELEVANT COMPELLING GOVERNMENTAL INTEREST

When strict scrutiny applies, "a heavy burden of justification is on the State, and . . . the statute will be closely scrutinized in light of its asserted purposes." *Dunn*, 405 US at 343. The state must demonstrate that 2005 PA 71 is "'necessary to promote a compelling governmental interest.'" *Id.* at 342, quoting *Shapiro v Thompson*, 394 US 618, 634; 89 S Ct 1322; 22 L Ed 2d 600 (1969) (emphasis omitted); *Kramer*, 395 US at 627. And even if a compelling interest can be shown, the state must use the least restrictive means to advance that interest.

> [T]he State cannot choose means that unnecessarily burden or restrict constitutionally protected activity. Statutes affecting constitutional rights must be drawn with "precision," and must be "tailored" to serve their legitimate objectives. And if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose "less drastic means." [*Dunn*, 405 US at 343 (citations omitted).]

The interest that has been put forth for the photo identification requirements is that they will prevent voter fraud. The prevention of voter fraud is clearly a legitimate governmental objective. But, there is no evidence at present that voter fraud is a significant problem in Michigan. In fact "Michigan enjoys an election history that is relatively fraud-free." *Bay Co Democratic Party v Land,* 347 F

15

Supp 2d 404, 437 (ED Mich, 2004) (citing Attorney General Opinion No 6930).

And voter fraud appears to be very low nationally, as well.[22]

More fundamentally, there are many types of voter fraud. 2005 PA 71 addresses only one: in-person polling place fraud that involves the impersonation of a registered voter. Yet, those arguing in favor of the photo identification requirements have not come forward with any documented instances of in-person voter fraud.[23]

---

[22] See Minnite & Callahan, *Securing the Vote: An Analysis of Election Fraud* (Demos, A Network for Ideas and Action, 2003), at: <http://www.demos.org/pubs/EDR_-_Securing_ the_Vote.pdf> (accessed July 11, 2007). After a review of news and legal databases and after interviews with state election officials, the authors found that, between 1992 and 2002, election fraud was "very rare" and a "minor problem" that "rarely affects election outcomes." *Id.* at 4, 17.

See also E. Lipton & I. Urbina, *In 5-Year Effort, Scant Evidence of Voter Fraud,* NY Times (April 12, 2007) <http://www.nytimes.com/2007/04/12/washington/12fraud.html?pagewanted=1&e i=5088&en=277feccfa099c7d0&ex=1334030400> (accessed July 16, 2007). In the aftermath of the 2000 presidential election, the Department of Justice began an aggressive probe of voter fraud. That investigation revealed "virtually no evidence of any organized effort to skew federal elections." Some have argued that the accusations of voter fraud have been advanced to mask efforts to suppress the rights of some to vote. There is evidence that supports this argument. See G. Gordon, *2006 Missouri Election was Ground Zero for GOP*, McClatchy Newspapers (May 2, 2007) <http://www.realcities.com/mld/krwashington/ news/nation/17168096.htm> (accessed July 11, 2007). And, it has been advanced by the opponents of 2005 PA 71. In his dissent, Justice Cavanagh makes a persuasive argument regarding the requirements' potential negative effects on certain groups of voters.

[23] And it is not a lack of diligence that has prevented the production of such evidence. Rather, it is because there has not been a single documented instance of in-person voter fraud in the state of Michigan. In fact, it appears that only one

(continued…)

Accordingly, the photo identification requirements are a solution in search of a problem. This is a particularly serious matter given that they affect and hinder the exercise of the fundamental constitutional right to vote. In order for the restrictions to withstand challenge, a constitutionally sufficient compelling governmental interest would have to be shown. But such an interest is conspicuously absent in this case.

## I. THE LEAST RESTRICTIVE MEANS

Even assuming a constitutionally sufficient justification could be shown, the government must employ the least restrictive means of furthering that interest. The photo identification and affidavit requirements are not the least restrictive means. The goals of 2005 PA 71 may be achieved by more limited means that do not discriminate against and threaten to disenfranchise a large number of qualified Michigan voters. First, Chapter XXIII of the Election Law, MCL 168.491 to 168.524, already establishes comprehensive safeguards aimed at preventing fraudulent voting. The fact that there are no documented cases of in-person voter fraud suggests that these less drastic, nondiscriminatory means have adequately advanced the state's interest.

Another safeguard is the matching of signatures. In states that utilize voter signature matching, each voter is required to sign the poll sheet. The signature is

(…continued)
allegation of in-person fraud has ever been made to the Secretary of State, and that allegation was never substantiated.

17

then matched against the signature acquired at registration. Michigan utilizes this method in precincts where digital signatures are available. MCL 168.523. A less restrictive alternative to the photo identification requirements would be to ensure that all precincts have digital signatures available.[24]

Another safeguard is to permit voters the use of nonphoto identification. Seventeen states utilize this method.[25] If Michigan were to allow flexible nonphoto identification, it would avoid the prejudice to eligible voters who lack state-issued photo identification.

Unlike the above safeguards, the photo identification requirements of 2005 PA 71 pose an extreme remedy to an unsubstantiated problem. When the remedy causes a greater harm than the problem, it cannot survive strict scrutiny. All the aforementioned options represent less drastic means to accomplish the state's interest in preventing voter fraud. Hence, the photo identification requirements are not the least restrictive means to advance the asserted state interest. For the reasons I have detailed, 2005 PA 71 violates the federal constitution.

---

[24] The majority claims that signature matching is not a less restrictive option because it would still require a signature. What the majority overlooks is that signature matching would require a signature from *everyone*, not just those who lack photo identification. It is this difference that makes signature matching a less restrictive, less discriminatory alternative.

[25] Study by National Conference of State Legislatures, available at <http://www.ncsl.org/programs/legismgt/elect/taskfc/voteridreq.htm> (accessed July 11, 2007).

### III. THE MICHIGAN CONSTITUTION

A complete analysis of 2005 PA 71 must also include consideration of the Michigan Constitution. "State courts cannot rest when they have afforded their citizens the full protections of the federal Constitution. State constitutions, too, are a font of individual liberties, their protections often extending beyond those required by the [United States] Supreme Court's interpretation of federal law."[26]

That the state constitution requires an independent interpretation is not a novel concept. For much of the nation's history, state constitutions have been invoked to protect individual rights and often have been found to provide greater protection than the federal constitution.[27] The idea that state courts are not only free to interpret their constitutions independently, but have a duty to do so, is derived from federalism itself.[28]

James Madison acknowledged this principle when he stated, "In the compound republic of America, the power surrendered by the people is first divided between two distinct governments, and then the position allotted to each subdivided among distinct and separate departments. Hence a double security arises to the rights of the people. The different governments will control each

---

[26] Brennan, *State constitutions and the protection of individual rights*, 90 Harv L R 489, 491 (1977).

[27] Note: *Neither Icarus nor ostrich: State constitutions as an independent source of individual rights*, 79 NYU L R 1833, 1835 (2004).

[28] *Id.* at 1842.

other, at the same time that each will be controlled by itself."[29] The Federalist No. 51.

In *Sitz v Dep't of State Police*,[30] this Court thoughtfully explained the role that the federal constitution plays in interpreting our state constitution.

> Where a right is given to a citizen under federal law, it does not follow that the organic instrument of state government must be interpreted as conferring the identical right. Nor does it follow that where a right given by the federal constitution is not given by a state constitution, the state constitution offends the federal constitution. It is only where the organic instrument of government purports to deprive a citizen of a right granted by the federal constitution that the instrument can be said to violate the constitution.
>
> * * *
>
> . . . As a matter of simple logic, because the texts were written at different times by different people, the protections afforded [by the two constitutions] may be greater, lesser, or the same. [*Sitz,* 443 Mich at 760-762.]

When interpreting our constitution, therefore, "[t]he right question is not whether [the] state's guarantee is the same as or broader than its federal counterpart as interpreted by the [United States] Supreme Court. The right question is what the state's guarantee means and how it applies to the case at

---

[29] Similarly, Justice Brandeis recognized the benefits of our federal system when he stated in *New State Ice Co v Liebmann*, 285 US 262, 311; 52 S Ct 371; 76 L Ed 747 (1932) (Brandeis, J., dissenting), "It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country."

[30] 443 Mich 744; 506 NW2d 209 (1993).

hand."[31]   And though the United States Supreme Court's interpretation of the federal constitution may be a polestar to help us navigate to the correct interpretation of our constitution, it is no more than that.   Ultimately, it is our constitutional duty to independently interpret the Michigan Constitution.

The Michigan Supreme Court has long recognized the duty by engaging in a "searching examination to discover what 'law the people [of Michigan] have made.'"   *Sitz*, 443 Mich at 759 (citation omitted).   As Chief Justice Cooley correctly stated well over 100 years ago, the state Supreme Court's "duty is to enforce the law which the people have made, and not some other law which the words of the constitution may possibly be made to express."   *People v Harding*, 53 Mich 481, 485; 19 NW 155 (1884).

Hence we must determine what level of protection the people of Michigan have provided against infringements on the right to vote.   The surest way to answer this question is to examine the specific provisions of the Michigan Constitution dealing with that right.

## A.  ARTICLE 2, SECTION 1

Article 2, § 1 of the Michigan Constitution states that "[e]very citizen of the United States who has attained the age of 21 years, who has resided in this state six months, and who meets the requirements of local residence provided by law, shall be an elector and qualified to vote in any election except as otherwise

---

[31] Linde, *E pluribus—Constitutional theory and state courts*, 18 Ga L R 165, 179 (1984).

21

provided in this constitution." By its terms, this clause provides that individuals who have met certain requirements are "qualified to vote."

In giving meaning to the phrase "qualified to vote," this Court "discerns the common understanding of constitutional text by applying [the] term's plain meaning . . . ." *Wayne Co v Hathcock*, 471 Mich 445, 468-469; 684 NW2d 765 (2004). The word "qualified" is defined as "having met the conditions required by law or custom for exercising a right, holding an office, etc." *Random House Webster's College Dictionary* (2001). Article 2, § 1, therefore, expressly confers the right to vote on any United States citizen, age 21 or older, who has been a Michigan resident for six months, and who meets local residency requirements.[32] The question then becomes whether the photo identification and affidavit requirements unconstitutionally infringe on this right.

---

[32] The Twenty-sixth Amendment of the United States Constitution has lowered the voting age to 18. And, as the majority points out, other constitutional provisions may specifically take away an otherwise qualified individual's right to vote. See, for example, Const 1963, art 2, § 2, which permits the exclusion of citizens from voting because of mental incompetence or commitment to a jail or penal institution. However, unless another constitutional provision specifically provides otherwise, anyone who meets the requirements of art 2, § 1 is qualified to vote. The majority claims that the Purity of Elections Clause is one of the constitutional provisions that provides otherwise. So, the majority asserts, the framers of our constitution thought it important enough to set forth the qualifications to vote but then added the Purity of Elections Clause. The majority believes that the framers inserted that clause so that the Legislature could later add any other qualification it felt like adding. This argument cannot withstand scrutiny. To read the Purity of Elections Clause as broadly as the majority wishes would essentially render art 2, § 1 meaningless. I cannot accept that our framers would adopt a meaningless constitutional provision.

22

When the constitutionality of legislation is examined, a showing of "[d]ifferent degrees of state interest [is] required by the courts, depending upon the type of private interest which is being curtailed." *Kropf v Sterling Hts*, 391 Mich 139, 157-158; 215 NW2d 179 (1974). The strict scrutiny standard of review applies to "legislation [that] impinge[s] on a fundamental right explicitly or implicitly guaranteed by the constitution." *In re Kasuba Estate*, 401 Mich 560, 570; 258 NW2d 731 (1977); *Kropf*, 391 Mich at 157-158. Because our constitution expressly confers the right to vote on individuals who have satisfied the requirements of art 2, § 1, any infringement on that right, beyond these requirements, is subject to strict scrutiny review.[33]

## B. *WILKINS V ANN ARBOR CITY CLERK*[34]

It is consistent with the decisions of this Court that infringements on the right to vote not in art 2, § 1 are invalid under the Michigan Constitution, unless they withstand the most exacting review. For example, in *Wilkins*, this Court considered whether a statute that precluded certain students from registering to

---

[33] Article 2, § 1 is not the only constitutional provision that gives rise to the requirement that strict scrutiny apply to regulations that impair the right to vote. The Michigan Constitution begins with the declaration that "[a]ll political power is inherent in the people. Government is instituted for their equal benefit, security and protection." Const 1963, art 1, § 1. Additionally, the Michigan Equal Protection Clause prohibits any person from being denied the enjoyment of his or her "political rights." Const 1963, art 1, § 2. These constitutional provisions indicate that the people of Michigan attach the utmost importance to the fundamental right to vote.

[34] 385 Mich 670; 189 NW2d 423 (1971).

vote in the state violated the Equal Protection Clause of the state constitution.[35]

*Wilkins*, 385 Mich at 675-676.  We held that the constitution "guards against subtle restraints on the right to vote, as well as outright denial"[36] and actual denial of the right need not be shown in order for strict scrutiny review to be required. *Id.* at 685.  The statute at issue in *Wilkins* placed a burden on the students' right to vote.  There were less restrictive ways of accomplishing the state interests of preventing voter fraud and providing for an educated electorate.  Hence the Court found that the statute violated the Equal Protection Clause of the state constitution.[37]  *Id.* at 694.

---

[35] The Equal Protection Clause is at art 1, § 2 of the Michigan Constitution.

[36] *Id.* at 684.

[37] The majority disregards *Wilkins* because *Wilkins* relied on federal law. But *Wilkins*'s reliance on federal law is irrelevant.  *Sitz*, 443 Mich at 762 n 12 ("'state courts are not required to incorporate federally-created principles into their state constitutional analysis'") (citation omitted).  The *Wilkins* Court held that any infringement on the right to vote triggers strict scrutiny review under the Michigan Equal Protection Clause.  That the United States Supreme Court may have altered its interpretation of the federal constitution is not adequate reason to abandon a prior decision of this Court interpreting the Michigan Constitution.  This Court should "not disregard the guarantees that our constitution confers on Michigan citizens merely because the United States Supreme Court has withdrawn or not extended such protection."  *Id.* at 759.

The majority also claims that *Wilkins* did not consider art 2, § 4 of the Michigan Constitution.  The majority's reading of *Wilkins* is incorrect. In *Wilkins*, the Court noted that the Court of Appeals had upheld the statute because it was a valid exercise of legislative authority under art 2, § 4.  *Wilkins,* 385 Mich at 685. See also *Wilkins v Ann Arbor City Clerk*, 24 Mich App 422, 427; 180 NW2d 395 (1970).  The Court rejected this argument because regulations enacted under this
(continued…)

## C. *MICHIGAN STATE UAW COMMUNITY ACTION PROGRAM COUNCIL v SECRETARY OF STATE*[38]

Similarly, in *Michigan State UAW,* this Court considered whether a statute automatically disqualifying inactive voters violated art 2, § 1 of the Michigan Constitution. *Michigan State UAW,* 387 Mich at 513. After emphasizing the fundamental importance of the right to vote, we found that the law was unconstitutional, unless it was supported by a compelling state interest. *Id.* at 514. Indeed, the Court held that "[a]ny burden, however small, will not be permitted unless there is demonstrated a compelling state interest."[39] *Id.* at 516.

The government had argued that it was within the Legislature's powers under art 2, § 4 of the Michigan Constitution to disqualify inactive voters. Article 2, § 4 authorizes the enactment of "laws to preserve the purity of elections, to preserve the secrecy of the ballot, to guard against abuses of the elective franchise,

---

(…continued)

constitutional provision still must be supported by a compelling state interest. *Wilkins,* 385 Mich at 685-687.

[38] 387 Mich 506; 198 NW2d 385 (1972).

[39] The majority claims that, when properly read, *Michigan State UAW* does not stand for the proposition that the Michigan Constitution requires the application of strict scrutiny to all voters-rights cases. I am baffled by this statement. In *Michigan State UAW*, the Court was very explicit in stating that it was considering *only* whether the statute at issue violated the Michigan Constitution, specifically art 2, § 1. The Court held that "[a]ny burden [on the right to vote], however small, will not be permitted unless there is demonstrated a compelling state interest." *Michigan State UAW,* 387 Mich at 516. The only possible way this decision can be read is that art 2, § 1 of the Michigan Constitution requires the application of strict scrutiny to regulations that burden the right to vote.

and to provide for a system of voter registration and absentee voting." *Michigan State UAW*, 387 Mich at 515. This Court rejected that argument, finding that "the state still must demonstrate a compelling state interest to justify a law passed pursuant to this section." *Id.* at 516. And, because a comprehensive set of safeguards were already in place to accomplish the purported governmental interest of preventing voter fraud, this Court struck down the statute as unconstitutional.[40] *Id.* at 517-520.

## D. *SOCIALIST WORKERS PARTY V SECRETARY OF STATE*[41]

In *Socialist Workers Party*, at issue was a statute requiring new political parties to meet both a petition requirement and a minimum-primary-vote requirement to appear on the general election ballot. *Socialist Workers Party*, 412 Mich at 580. Again, the plaintiffs argued that the requirements violated the Equal Protection Clause of the state constitution. *Id.* at 582. This Court agreed, determining the requirements unconstitutional because they were not narrowly

---

[40] The majority also claims that *Michigan State UAW* failed to consider the effect of art 2, § 4 of the Michigan Constitution. The majority's reading of this opinion is incorrect. In *Michigan State UAW*, 387 Mich at 516, this Court explicitly recognized that the government had argued that the statute was authorized by this constitutional provision. This Court rejected the argument, determining that "the state still must demonstrate a compelling state interest to justify a law passed pursuant to [art 2, § 4]."

[41] 412 Mich 571; 317 NW2d 1 (1982).

tailored to achieve a compelling state interest.[42] *Id.* at 594. The Court held, also, that the law violated art 2, § 4 of the Michigan Constitution, the "'purity of elections'" clause. *Socialist Workers Party*, 412 at 599.

In deciding that the statute violated the Purity of Elections Clause, the Court recognized that the clause embodies "two separate concepts: first, that the constitutional authority to enact laws to preserve the purity of elections resides in the Legislature; and second, 'that any law enacted by the Legislature which adversely affects the purity of elections is constitutionally infirm.'" *Id.* at 596 (citation omitted). The Court found that a law that undermined the fairness and evenhandedness of an election would be invalid. *Id.* at 598-599. And, because the statute at issue gave parties already established an advantage over new parties, the Court held that the statute violated the clause. *Id.*

This Court's decisions in *Wilkins*, *Michigan State UAW*, and *Socialist Workers Party* stand for the proposition that any infringement on the right to vote,

---

[42] The majority finds that *Socialist Workers Party* can be discarded because it relied on federal precedent in interpreting the Michigan Constitution. In *Socialist Workers Party,* this Court found that strict scrutiny applied under the Michigan Constitution. It relied on the federal constitution in making that decision. Regardless, the case is relevant to show that, under the state constitution, strict scrutiny applies to the requirements at issue. As I stated earlier, this Court should "not disregard the guarantees that our constitution confers on Michigan citizens merely because the United States Supreme Court has withdrawn or not extended such protection." *Sitz*, 443 Mich at 759.

27

however minor, is subject to strict scrutiny under the Michigan Constitution.[43]

These decisions also illustrate the proper role of the Purity of Elections Clause. The Legislature is free to enact new laws under this clause, but any legislation that threatens to disenfranchise voters or that undermines the fairness of an election will be invalid.

The requirements at issue in the instant case infringe on the right to vote by creating an obstacle that burdens the right of qualified voters to cast a ballot. Hence, the teaching of *Wilkins*, *Michigan State UAW,* and *Socialist Workers Party* is that these requirements are unconstitutional, unless they are narrowly tailored to achieve a compelling governmental interest.

### E. FACTORS TO BE WEIGHED

We are required by the language of our state constitution and the decisions of this Court interpreting that language to find that infringements on the right to

---

[43] The majority claims that these decisions can be ignored because they were decided at a time when all voting regulations were subject to strict scrutiny. This simply is not true. At the same time this Court decided *Michigan State UAW* and *Wilkins,* and over ten years before this Court decided *Socialist Workers Party*, the United States Supreme Court explicitly maintained that "not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review." *Bullock*, 405 US at 143. Accordingly, to claim that this Court decided these cases assuming that strict scrutiny applies to all voting regulations assumes that past members of the Court misunderstood the decisions of the United States Supreme Court. This is an insulting assumption. Out of deference to and respect for my predecessors, I assume that they were well aware that the federal constitution did not require application of strict scrutiny in all instances. Rather, they made a conscious decision that the Michigan Constitution, unlike the federal constitution, requires any infringement on the right to vote to withstand strict scrutiny review.

vote are subject to strict scrutiny.  But an additional reason supports that finding.

On past occasions, this Court has cited factors that are helpful in determining

when it is appropriate to find that the state constitution affords more protection

than its federal counterpart.  When these factors are weighed, it is apparent that

our state constitution affords greater protection against infringements on the right

to vote than does the federal constitution.[44]

The factors are (1) the textual language of the state constitution, (2)

significant textual differences between parallel provisions of the two constitutions,

(3) structural differences between the state and federal constitutions, (4) state

constitutional and common-law history, (5) state law preexisting adoption of the

relevant constitutional provision, and (6) matters of peculiar state or local interest.

*Sitz*, 443 Mich at 763 n 14.

Article 2, § 1 of the Michigan Constitution expressly confers the right to

vote on individuals who satisfy the requirements set forth in that section.  This is a

difference between the Michigan Constitution and the federal constitution.  The

federal constitutional provisions regarding the right to vote prohibit denial of the

right on the basis of certain protected characteristics.  But the federal constitution

---

[44] Numerous state courts have found that their state constitution affords greater protection against infringements on the right to vote than the federal constitution.  E.g., *Weinschenk v State*, 203 SW3d 201, 212 (Mo, 2006); *Maryland Green Party v Maryland Bd of Elections*, 377 Md 127, 150; 832 A2d 214 (2003).

does not expressly give anyone the right to vote.[45]  *San Antonio Independent School Dist v Rodriguez*, 411 US 1, 34 n 74; 93 S Ct 1278; 36 L Ed 2d 16 (1973). The fact that the Michigan Constitution confers the right to vote on qualified electors while the federal constitution does not, supports the conclusion that the Michigan Constitution affords greater protection than its federal counterpart.

The language of the Michigan Constitution also differs from the federal constitution in that the Michigan Equal Protection Clause[46] protects "political

---

[45] The Fifteenth Amendment provides:

> The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

The Nineteenth Amendment provides:

> The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of sex.

> Congress shall have power to enforce this article by appropriate legislation.

The Twenty-sixth Amendment provides:

> The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age.

> Congress shall have power to enforce this article by appropriate legislation.

[46] Const 1963, art 1, § 2.  This provision provides:

(continued…)

30

rights," whereas the federal Equal Protection Clause[47] does not. Additionally, art 1, § 1 of the Michigan Constitution declares that "[a]ll political power is inherent in the people." The federal constitution contains no analogous constitutional provision.

There are also structural differences between our constitution and the federal constitution that indicate that the state constitution provides greater protection against infringements on the right to vote. Unlike the federal constitution, the Michigan Constitution dedicates an entire article to elections.[48] This signifies the importance that the Michigan people attach to the right to vote. The federal constitution contains no parallel article regarding elections.

Another difference is that, unlike federal caselaw, the decisions of this Court have uniformly held that infringements on the right to vote are subject to

---

(…continued)

> No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation.

[47] US Const, Am XIV, § 1. This provision provides:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

[48] All of art II is dedicated to elections.

strict scrutiny. Before today, in every case decided under the current state constitution, this Court applied strict scrutiny to statutes that impaired the right to vote. See *Wilkins*, *Michigan State UAW,* and *Socialist Workers Party*. On the other hand, the federal courts have long recognized that different levels of scrutiny will apply depending on how significant the burden is. See, e.g., *Storer,* 415 US at 730; *Anderson*, 460 US at 788.

And even long before the ratification of our current constitution, this Court recognized the fundamental and paramount nature of the right to vote, explaining that "[n]o elector can lose his right to vote, the highest exercise of the freeman's will, except by his own fault or negligence." *Attorney General, ex rel Conely v Detroit Common Council*, 78 Mich 545, 563; 44 NW 388 (1889). This Court's decision in the *Detroit* case suggested, also, that the appropriate recourse for those seeking to prevent fraud by imposing an identification requirement is a constitutional amendment, not legislation.

> If the exigencies of the times are such, which I do not believe, that a fair and honest election cannot be held in Detroit, or in any other place in our State, without other qualifications and restrictions upon both native-born and naturalized citizens than those now found in or authorized by the Constitution, then the remedy is with the people to alter such Constitution by the lawful methods pointed out and permitted by that instrument. [*Id.* at 564.]

Accordingly, for well over 100 years, this Court has held that restrictions that threaten to disenfranchise otherwise eligible voters are invalid, absent a constitutional amendment or a compelling government interest. This fact weighs heavily in favor of finding greater protection under the state constitution.

Finally, voting is fundamentally a matter of local concern. The federal constitution leaves the regulation of elections largely to the states. The Elections Clause of the federal constitution provides that the state legislatures shall prescribe the "Times, Places and Manner of holding Elections for Senators and Representatives . . . ." US Const, art I, § 4, cl 1. The individual states have complete control, also, over the election process for state offices. *Tashjian v Republican Party of Connecticut*, 479 US 208, 217; 107 S Ct 544; 93 L Ed 2d 514 (1986).

The fact that the states are granted such broad regulatory power indicates that this is an area where state constitutions likely include greater protection against potential abuses. This is confirmed by the fact that the Michigan Constitution expressly sets forth the qualifications for voting, whereas under the federal system, qualifications are left to legislative determination. Compare US Const, art I, § 2, which provides that federal electors must be equivalent to those for state positions, with Const 1963, art 2, § 1, which provides that an individual who meets certain requirements is qualified to vote. Because the federal constitution leaves the regulation of elections largely to the states, it makes sense that the state constitutions would provide greater protection against potential election abuses.

For all of the above reasons, I would hold that any infringement on the right to vote is unconstitutional under the Michigan Constitution, unless it can withstand the most exacting scrutiny. The photo requirements of 2005 PA 71 infringe on the

fundamental right to vote and, as demonstrated in the preceding section, are not narrowly tailored to achieve a compelling state interest. Hence, I would declare these requirements unconstitutional.[49]

The majority disagrees with my conclusion and finds that the Michigan Constitution affords no greater protection against regulations that burden the right to vote than does the federal constitution. But, in deciding that 2005 PA 71 does not violate the Michigan Constitution, the majority simply follows federal precedent in lockstep. I strongly disagree with this approach. It is the functional equivalent of giving the United States Supreme Court the ability to amend the Michigan Constitution. To quote Justice Dennis of the Louisiana Supreme Court, "my colleagues have sunk this court to the lowest pitch of abject followership. They no longer believe in our state constitution as an act of fundamental self-government by the people . . . . They no longer perceive this court to be the final arbiter of the meaning of that constitution, bound by the intent of the drafters and ratifiers as reflected by the text, the drafting history, and this court's constitutional precedents. Instead, for them, our state constitution is a blank parchment fit only as a copybook in which to record the [decisions of the United States Supreme Court.]" *State v Tucker*, 626 So 2d 707, 719 (La, 1993).

---

[49] 2005 PA 71 cannot withstand strict scrutiny review because (1) there is no evidence that in-person voter fraud is a significant problem in Michigan, and (2) even if it were, there are other methods to combat fraud that are less burdensome than the requirements at issue.

IV. CONCLUSION

A review of the United States Supreme Court decision in *Burdick* shows that strict scrutiny continues to be the standard of review applicable here. *Harper, Kramer,* and *Dunn* are still good law.

But even if the Fourteenth Amendment of the federal constitution did not require it, the Michigan Constitution demands that 2005 PA 71 pass the strict scrutiny test in order to be pronounced constitutional. *Detroit Common Council, Wilkins, Michigan State UAW,* and *Socialist Workers Party* all speak to that fact.

The right to vote is fundamental, and the strict scrutiny test must be applied to any statute that infringes on it. It is beyond question that the requirements of 2005 PA 71 infringe on the right to vote by adding conditions to a voter's access to the polling place. These conditions fail the strict scrutiny test because no compelling state interest in them has been demonstrated. Significant in-person voter fraud has not been shown to exist in Michigan. But, even if it had, less burdensome methods exist to combat whatever voter fraud may threaten to erupt. 2005 PA 71 should be held unconstitutional.

Those most severely prejudiced by today's decision are the impoverished and the disadvantaged. Yet, Michigan has always enjoyed a strong reputation for the protection of our civil rights. This tragic decision has the potential to wipe out many of this state's achievements in this area. I believe that history will judge us

35

harshly for joining those states that have limited the precious constitutional right to vote.  Accordingly, I dissent.

Marilyn Kelly